**BONNER C. WALSH**
Oregon State Bar ID Number131716
bonner@walshpllc.com
WALSH LLC
1561 Long Haul Road
Grangeville, ID 83530
Tel: (541) 359-2827

**JASON P. SULTZER**
(*pro hac vice* forthcoming)
Joseph Lipari (*pro hac vice* forthcoming)
Adam Gonnelli (*pro hac vice* forthcoming)
sultzerj@thesultzerlawgroup.com
The Sultzer Law Group P.C.
85 Civic Center Plaza, Suite 104
Poughkeepsie, NY 12601
Tel: (845) 483-7100

**Counsel for Plaintiffs and the Class**
(Additional counsel appear on signature page)

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| ROBERT S. KEY, TYLER HADFIELD, LAURA HUTCHINS, MICHAEL HALL, AARON MEACHAM, SCOTT GILES, GREG PULVER, JOSHUA MINOR, HEIDI METZGER, HOWARD KRAMER REALTY, BOTTONE/REILING, P.C., KEVIN CRAWFORD, ANGELO PANDAZIS, MARIA ENIK, EDWARD SIBERT, GEORGE APPLE, PARKER BANNING, ASHLEY PRICE, SEREN ALVAREZ, BEN RICHARDSON, AARON GROVER, and MARTIN HALL, individually on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v. | Case No.  3:18-CV-0534<br><br>CLASS ACTION ALLEGATION COMPLAINT<br><br>MAGNUSON-MOSS (15 U.S.C. § 2310), STRICT PRODUCTS LIABILITY, NEGLIGENCE, BREACH OF WARRANTY, UNJUST ENRICHMENT AND VARIOUS STATE LAW CLAIMS<br><br><u>JURY TRIAL DEMANDED</u> |

1 – PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

INTEL CORPORATION,

Defendant.

Plaintiffs individually and on behalf of all others similarly situated, by their attorneys, allege the following upon information and belief, except for those allegations pertaining to individual plaintiffs, which are based on personal knowledge:

## INTRODUCTION

1.      Twenty-two plaintiffs from nineteen states bring this action against defendant Intel Corporation ("Intel" or "Defendant") on behalf of all persons who purchased a defective Intel core processor ("CPU") or a computing device built with a defective Intel core processor ("Affected Products").

2.      Intel's CPUs suffer from both hardware and software security defects which make sensitive data, data that should be well secured, vulnerable to exploitation (the "Defects"). Because the Defects include hardware design problems, a full remedy would require replacement of the CPUs themselves. As for the software, attempted "patches," or "microcode updates,"[1] dramatically reduce performance of the CPU. The Defects exist in all Intel x86-64x CPUs manufactured since at least 2004. The x86-64x CPU is, and was, used in the majority of all desktop, laptop computers, and servers in the United States, and indeed, is and was used in many mobile devices, cloud

---

[1] Intel Microcode Revision Guidance, at https://newsroom.intel.com/wp-content/uploads/sites/11/2018/03/microcode-update-guidance.pdf (Accessed March 27, 2018).

infrastructures, and virtual machines.

3.      Millions of consumers and businesses are now in the position of continuing to use CPUs with serious security vulnerabilities or using computers with software patches that dramatically degrade performance.

4.      Intel has announced a new generation of CPUs that will be rolled out in late 2018 that will be free of the Defects.  However, the new CPUs will be expensive and will force consumers to incur significant additional costs to purchase new computers or CPUs that are free of the Defects.  Consumers should not have to incur these costs.

5.      Plaintiffs and the consumers and businesses they seek to represent suffered injury in fact and a loss of money or property as a result of Defendant's conduct in designing, manufacturing, distributing and selling defective CPUs.  Plaintiffs and class members have paid more for computer and CPUs than they would have if they had known about the Defects.

## FACTS

## Intel's Representations About Its Security and Performance

6.      Intel is a self-proclaimed "world leader" in technology that employs 106,000 employees worldwide and has 600 facilities in 63 countries.[2]

7.      Intel manufactures central processing units ("processors" or "CPUs") which are installed in the majority of desktop computers, laptops, and other computing devices in the United States.

---

[2] http://csrreportbuilder.intel.com/PDFfiles/CSR-2016_Full-Report.pdf  (Accessed 3/21/2018).

8.    Intel promotes its brand directly to consumers, and in partnership with hundreds of businesses licensed to use Intel's brand on their devices, through its "Intel Inside®" program.[3]

9.    CPUs execute the instructions sent to the computer by software.  The processors' ability to manage the flow of instructions largely determines the speed at which the computer can accomplish its tasks.

10.    In addition, the processors' ability to keep the flow of instructions and data secure is crucial to maintaining the confidentiality and integrity of computers and networks.  Intel's representations about the security of its processors include:

- "Get security and style without any compromises. The latest Intel® Core™ vPro™ processor-based Ultrabook devices deliver the hardware-enhanced security and manageability your business needs with sleek designs users want."[4]

- "Take creativity and collaboration to the next level. Reduce downtime and limit IT disruption with true workstation performance for the most demanding workloads."[5]

- "The Intel® Xeon® Scalable platform delivers the next generation of features to secure the platform, increase trust, and protect data without compromising performance."[6]

---

[3] Intel Inside® Program, at https://www.intel.com/content/www/us/en/company-overview/intel-inside-program.html  (Accessed 3/27/2018).
[4] https://www.intel.com/content/www/us/en/enterprise-security/laptops-for-business.html (Accessed 3/21/2018).
[5] *Id.*
[6] http://www.wcs.synnexus.marketingstudio.intel.com/sw/swchannel/CustomerCenter/documents /19765/83158/Security-Without-Compromise-Infographic.pdf  (Accessed 3/21/2018).

4 – PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND



- "Enjoy amazing computing experiences and more control over personal content and information with an Intel® Core™ processor based desktop PC including hardware-based security features to keep systems free of hacking or viruses."[7]

## Discovery of the Defects within the Information Security Community

11.    At some point before June of 2017, Google's "Project Zero" security research team discovered three design defects (the "Defects") in Intel processors.

12.    Project Zero named the three defects Spectre Variant 1, Spectre Variant 2, and Meltdown Variant 3.

13.    Project Zero produced "proof of concept" code, which is a program that can demonstrate the Defects in practical terms.

14.    The proof of concept code demonstrated that a website browser was capable of exploiting the Defects.

15.    These Defects are believed to exist in almost every Intel processor made since at least 2004 regardless of the operating system. Intel's x86-64x processors are the most widely used chips in virtually all desktop and laptop computers.

---

[7] https://www.intel.com/content/www/us/en/desktops/desktop-storylines-security-infographic.html  (Accessed 3/21/2018).

16.    The Intel processors are also used in most of the large, cloud-based servers such as those from Google, Microsoft and Amazon.

## **The Defects**

17.    The physical architecture of Intel's chips has layers, or "rings" with different levels of security.

18.    Different software is assigned different levels of security.

19.    For example, the most sensitive code, such as the most secure parts of the operating system itself, passwords, and encryption keys, are assigned the highest level of security.

20.    Common software that users directly interact with, such as web browsers, word processing software, and email systems, is assigned a lower level of security.

21.    The lowest level of security ring is also known as "User Land."

22.    Each ring has its own "memory address space," which has dedicated processing resources used to read and write data and execute instructions in that ring.

23.    The following diagram illustrates the ring structure of Intel chips:

## **Diagram 1**



24.     There are two central security assumptions underlying the ring structure.

25.     First, the boundaries between the rings are not supposed to be crossed without specific instructions to do so.  For example, a Microsoft Word document in Ring 3 ("User Land") might send a request to the printer driver operating in the more secure Ring 2 to send a copy of the document to the printer.

26.     Second, the other key security assumption of the chip architecture is that Ring 0 is reserved for the "Operating System Kernel" that controls the security for the entire system upon which it is installed.

27.     Ring 0, also commonly known as "root," is given a private memory address space that is not available to any other applications operating in any of the other rings.  Encryptions keys, cyphers, security codes, access control lists and other highly sensitive security details about the computer or system (and the organization it belongs to) are stored in this private address space.

28.     This makes the security of the Ring 0 private address space vital and its compromise a serious security hazard.

29.     This boundary between rings is crucial to the security of both the user's data and the system itself.

30.     The Defects are essentially flaws in the barriers between the rings that can permit unauthorized access to rings with higher levels of security, including the critical Ring 0.

## How the Defects Can Compromise Security

31.     In response to a demand for faster and more energy-efficient chips, Intel implemented a feature called "Speculative Execution."

32.     Speculative Execution allows the processor to predict what instructions it is likely to receive next from the software being run at the time.

33.     This allows the computer to save time and avoid bottlenecks which would otherwise slow operations.  As Intel states: "Without speculative execution, the processor would need to wait for prior instructions to be resolved before executing subsequent ones. By executing instructions speculatively, performance can be increased by minimizing latency and extracting greater parallelism."[8]

34.     These predictions are based on predictive algorithms and pattern analysis.  If the user performs the same tasks over and over, the accuracy of the predictions, and therefore effectiveness of speculative execution, increases.

35.     For example, if the user sends the same type of document to the same printer most of the time, the chip will assume that the series of instructions it is about to receive is the same set as in the past.

36.     The computer then begins to execute the instructions in a different order than originally intended by the software.

37.     It does this by breaking up the instructions into pieces and accessing unused processing capacity in other rings.

38.     If the processor predictions are accurate, speculative execution can greatly increase efficiency.

39.     For an average consumer who uses the same few programs over and over, such as Word, an internet browser, and email system, to accomplish similar tasks, speculative execution can increase efficiency by as much as 300-400% for these tasks.

---

[8] https://newsroom.intel.com/wp-content/uploads/sites/11/2018/01/Intel-Analysis-of-Speculative-Execution-Side-Channels.pdf  (Accessed 3/21/2018).

## The Security Defects Of Speculative Execution

40.     Intel states that speculative execution is a not a "detriment," but rather "performance benefit" that should be exploited.[9]

41.     However, because of the Defects, speculative execution compromises security due to the manner in which efficiencies are gained.

## Spectre Variant 1

42.     The first design flaw arising from speculative execution involved changing the way in which access to the rings and their memory address space boundaries are enforced by the operating system.

43.     One way speculative execution gains efficiencies is by accessing unused processing resources in other rings.

44.     In order to allow an application operating in one ring to use untapped resources in another ring's memory address space, Intel built a capability called a "Bounds Check Bypass," which allowed applications operating in a certain ring to reach into the memory address space of another ring to maximize resource utilization.

[THIS SPACE INTENTIONALLY LEFT BLANK]

---

[9] https://software.intel.com/en-us/articles/boost-game-performance-with threads?wapkw=%22speculative+execution%22  (Accessed 3/21/2018).

45.     The following diagram illustrates a distribution of work among 16 processors.

**Diagram 2**



46.     The first and third processors in the bottom row are maximized, so with speculative execution additional work is sent to other processors.

47.     This feature would not present a problem if instructions were only sent to rings with lower security. For example, if a process in Ring 0 accessed resources in Ring 1, security would not be threatened. But the Spectre Variant 1 permitted less secure code to access higher security rings.

48.     Thus, a relatively unsecure piece of code running a print job could be sent to the most secure part of the chip, Ring 0.

[THIS SPACE INTENTIONALLY LEFT BLANK]

49.    The picture below demonstrates the risk of a code from a browser in Ring 3 accessing Ring 0.

**Diagram 3**



## **Spectre Variant 2**

50.    Speculative execution also changes the way in which the sequencing of instructions from applications are sent to the processor for execution.

51.    This feature is known as "Branch Chain Execution," and at its most basic level it allows software application code from multiple sources to be broken apart and executed out of order to optimize the efficiency of the workload on the processor.

52.    Each discrete instruction from a piece of software has a security "tag" indicating how secure the operation is supposed to be and in which ring the operation is supposed to run.  The security tag also limits the operation to a specific ring.

53.    The defect called Spectre Variant 2 exists because when code is broken up by speculative execution to run operations more efficiently, these "tags" are lost; the pieces of code that are sent to other rings to access unused processing power do not have the security tags.

54.    This flawed design means that code that had been re-sequenced for optimal execution is no longer limited to the security ring it is supposed to be limited to.

55.    Since the code instructions could now be executed out of order and without their security credentials, malicious code can now just send instructions as part of the normal flow in a technique known as "injection."

[THIS SPACE INTENTIONALLY LEFT BLANK]

56.     An example of "injection" is displayed in the diagram below.

**Diagram 4**



**Meltdown Variant 3**

57.     The Meltdown flaw is a third variant of the same flaws created by the Speculative

Execution design decision in Intel processors.

58.     Meltdown uses a different exploit technique known as Rogue Data Cache Load in

which bad data is intentionally sent to the Ring in which the application is running to create a "jail

break" scenario to jump to the Ring 0.

## Project Zero's Proof of Concept

59. In June of 2017, Google's Project Zero security team gave Intel "proof of concept" source code that demonstrated how both of the Spectre design flaws could be exploited by a malicious application running in the computer's Internet browser.

60. The code was launched in the standard Ring 3 manner like any other application in "User Land" but then used the Spectre vulnerabilities to jump into a more privileged ring and access the memory address space and the data being used there.

61. This ability to step around the security rings in order to gain access to data in other rings is now known as a "Side Channel" attack.

62. The Project Zero team originally assumed that the proof of concept code would not work against the secured Ring 0 used by the Operating System, but it did. A second proof of concept exploit was developed that attempted to use the same design flaws to read the private highly secured address space reserved for Ring 0, which resulted in total system compromise.

63. The flaws found by Google's Project Zero have been given industry standard designations as vulnerabilities in the global Common Vulnerabilities and Exposures Database. This means they are assigned a shorthand designation, a "CVE," which is a unique numerical value that is a combination of the year in which they were discovered and a four-digit code.

64. The CVE designation for all three designs flaws are as follows:

CVE-2017-5753 ("Spectre Variant 1");

CVE-2017-5715 ("Spectre Variant 2");

CVE-2017-5754 ("Meltdown Variant 3").

65. The Common Vulnerability Scoring System (CVSS) provides an open framework for communicating the characteristics and impacts of IT vulnerabilities. CVSS consists of three

groups: Base, Temporal and Environmental. Each group produces a numeric score ranging from 0 to 10, and a Vector, a compressed textual representation that reflects the values used to derive the score. The Base group represents the intrinsic qualities of a vulnerability. The Temporal group reflects the characteristics of a vulnerability that change over time. The Environmental group represents the characteristics of a vulnerability that are unique to any user's environment. CVSS enables IT managers, vulnerability bulletin providers, security vendors, application vendors and researchers to all benefit by adopting this common language of scoring IT vulnerabilities.

66.    A score of 0 means that the vulnerability is relatively harmless, while a score of 10 means that the CVE in question is ranked as "critical" and is extremely dangerous.

67.    Most organizational and regulatory patch and vulnerability management systems require that an immediate or, "out-of-band" patch be released and applied for any CVE 10 level vulnerability.

68.    All three Defects at issue in this case are scored as Level 10.

## <u>Select Industry Members are Gradually Notified of the Defects</u>

69.    On or around June 1, 2017 Project Zero brought the defects and the proof of concept code to Intel's attention.

70.    Pursuant to standard industry practice, Google provided Intel a 90-day notification embargo on public disclosure to allow Intel to attempt to develop fixes for the flaws.

71.    Project Zero is known to be reluctant to keep such information secret for more than ninety days.

72.    Project Zero granted Intel extensions to attempt to fix the problem due to its magnitude.

73.     In late August, before the 90 days expired, Intel notified a select group of public cloud provider customers ("Tier One" providers) about the defect.   These companies were Microsoft, Apple, Amazon, ARM Holdings, and China-based Lenovo and Alibaba.

74.     No other companies were notified at that time.

75.     In early October, Intel's CEO began a $24 million stock selloff which would be completed by November 29.

76.     In early November, Microsoft sent a patch for the Defects to members of its "Insiders Program."   These companies are Microsoft's most important partners.

77.     Members of Microsoft's Insiders Program were under an NDA and could not speak publicly about the Intel defects or the Microsoft patch.

78.     On November 21, 2017 Intel notified the United States Department of Homeland Security that there might be a flaw in the Intel Management Engine, a tool developed by Intel to increase the security of Intel chips.

79.     Intel did not inform DHS about the Spectre and Meltdown defects.

80.     On or around November 30, 2017, operating system manufacturer Red Hat learned of the Defects.

81.     On December 1, 2017, Red Hat informed its most important partners of the Defects but, like Microsoft, did not make the information public.

## **The Public Learns About the Defects**

82.     As of January 1, 2018 only a handful of large companies knew about the Defects.

83.     On January 2, 2018 the British periodical The Register reported the three defects to the public:

> A fundamental design flaw in Intel's processor chips has forced a significant redesign of the Linux and Windows kernels to defang the chip-level security bug."[10]
>
> …
>
> [T]he bug is present in modern Intel processors produced in the past decade. It allows normal user programs – from database applications to JavaScript in web browsers – to discern to some extent the layout or contents of protected kernel memory areas.[11]

84.     Prior to the public disclosure of the Defects, Intel admitted it had not informed the U.S. government about Spectre or Meltdown.[12]   Its disclosure to the government was done in reaction to The Register's report.[13]

85.     On January 3, Intel publicly acknowledged the Defects:

> Intel and other technology companies have been made aware of new security research describing software analysis methods that, when used for malicious purposes, have the potential to improperly gather sensitive data from computing devices that are operating as designed. [14]

86.     But Intel also stated:

> Intel believes these exploits do not have the potential to corrupt, modify or delete data.[15]

87.     On January 8, 2018, at the Consumer Electronics Show in Las Vegas, Intel's CEO, Brian Krzanich, formally addressed the Defects but downplayed their significance: "As of now, we have not received any information that these exploits have been used to obtain customer data."[16]

---

[10] https://www.theregister.co.uk/2018/01/02/intel_cpu_design_flaw/  (Accessed 3/21/2018).
[11] *Id.*
[12] https://energycommerce.house.gov/wp-content/uploads/2018/02/Intel-Corp-response-HEC-FINAL.pdf  (Accessed 3/21/2018).
[13] *Id.*
[14] https://newsroom.intel.com/news/intel-responds-to-security-research-findings/  (Accessed 3/21/2018).
[15] *Id.*
[16] https://newsroom.intel.com/news/intel-ceo-addresses-security-research-findings-2018-ces-keynote-address/  (Accessed 3/21/2018).

17 – PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

## The Patch Attempts

88.     At some point between its notification of the six cloud providers in late November

of 2017 and the public disclosure of the flaw on January 3rd Intel issued a patch, or microcode

update, to address the Defects.

89.     On January 4, 2018, Microsoft publicly released an emergency patch to address the

Defects.  This patch was intended to work with Intel's patch that had not yet been publicly

announced.

90.     Accordingly, much of the Information Technology community, let alone

consumers and businesses, were left scrambling to find the Intel patch.

91.     The Microsoft emergency patch was also notable for its timing.  Microsoft

generally releases updates on a regular schedule every month.  When Microsoft issues an update

at a different time, the IT community understands that the update is urgent.

92.     On January 8, 2018, at the Consumer Electronics Show in Las Vegas, Intel's CEO,

Brian Krzanich, downplayed the significance of the Defects and stated that Intel had patches for

the Defects:  "For our processors, products introduced in the past five years, Intel expects to issue

updates for more than 90 percent of them within a week and the remaining by the end of January."[17]

93.     This was the first public announcement of the Intel patch.

94.     Mr. Krzanich also sought to minimize the impact of the patches on performance:

> We believe the performance impact of these updates is highly workload-
> dependent.  As a result, we expect some workloads may have a larger impact
> than others, so we will continue working with the industry to minimize the
> impact on those workloads over time."[18]

---

[17] https://newsroom.intel.com/news/intel-ceo-addresses-security-research-findings-2018-ces-keynote-address/  (Accessed 3/21/2018).
[18] *Id.*

18 – PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

95.     Intel also issued a statement downplaying the effects of the patches on performance:

> Based on our most recent PC benchmarking, we continue to expect that the performance impact should not be significant for average computer users. This means the typical home and business PC user should not see significant slowdowns in common tasks such as reading email, writing a document or accessing digital photos. Based on our tests on SYSmark 2014 SE, a leading benchmark of PC performance, 8th Generation Core platforms with solid state storage will see a performance impact of 6 percent or less*. (SYSmark is a collection of benchmark tests; individual test results ranged from 2 percent to 14 percent.)"[19]

96.     However, the next day, January 9th 2018, Microsoft and other recipients of the early, privately released patches began reporting wide spread stability and performance degradation issues.

97.     Cloud service providers also began to report that the Intel patch caused some systems to spontaneously shut down and in some cases could not be restarted.

98.     As reported by the Wall Street Journal on January 11, 2018, Intel realized the problems with its updates and told select large customers not to use them.

99.     On January 15, 2018 Intel retracted one of its Spectre patches because of random reboot issues, and suggested that system administrators roll it back or not use it if it had not been installed already.

100.    Also, on January 15th, Red Hat withdrew certain patches based on instabilities caused by Intel's patch.

101.    On January 18, 2018 the cloud infrastructure company VMWare stated that it would delay microcode—fundamental code that coordinates between hardware and low-level software—updates because of problems with Intel's firmware patches.

---

[19] https://newsroom.intel.com/news/intel-offers-security-issue-update/  (Accessed 3/21/2018).

102.    In addition, Lenovo and Dell had to withdraw certain patches. On January 21, 2018 Linux creator Linus Torvalds criticized Intel's patches for the Linux kernel in a public message board on Sunday. "All of this is pure garbage," Torvalds wrote. "The patches are COMPLETE AND UTTER GARBAGE. ... They do things that do not make sense."

103.    On January 22, 2018, eleven days after advising select customers, Intel advised the public to stop using the patch because of the reported widespread "stability" problems.

104.    Navin Shenoy, Intel's Executive Vice President and General Manager of the Data Center Group, recommended that:

> OEMs, cloud service providers, system manufacturers, software vendors and end users *stop deployment of current versions*, as they may introduce higher than expected reboots and other unpredictable system behavior."[20]

105.    On January 25, 2018 Intel disclosed for the first time that its mitigation attempts could lead to data loss or corruption.  Previously Intel had only disclosed unexpected reboots and unpredictable system behavior.

106.    On January 27, 2018 Microsoft issued an update to actually disable part of one of Intel's Spectre Variant 2 patches.

107.    But by this time, the Intel patch and series of fixes had been widely deployed.  Once the patch was deployed, it changed the manner in which the CPUs operate.

108.    This means that future patches and updates issued by Microsoft, and other software companies, need to account for different versions of past patches and updates and issue different updates depending on patch history.

---

[20] https://newsroom.intel.com/news/root-cause-of-reboot-issue-identified-updated-guidance-for-customers-and-partners/  (emphasis added) (Accessed 3/21/2018).

109.    Essentially, these different versions of Intel patches forced "downstream" users to keep deploying revised patches as well.

## **The Spectre Defects Cannot Be Repaired**

110.    In its public statements discussing patches and upgrades, Intel has sought to assuage public concern by conflating fixes for the Meltdown Defect with fixes for the Spectre Defect.

111.    In fact, the two Spectre variants cannot be fixed with software updates.  The flaws in chip architecture giving rise to the two Spectre Defects is part of the physical design of the Intel processors.

112.    Accordingly, the only real fix is a new and redesigned chip.

113.    Tacitly acknowledging this fact, on March 15, 2018 Intel announced the production of a new generation of chips, expected to ship in the second half of 2018.[21]

114.    Mr. Krzanich stated that Meltdown will be addressed via software patches, but hardware design changes will address the Spectre vulnerabilities.

> We have redesigned parts of the processor to introduce new levels of protection through partitioning that will protect against both Variants 2 and 3. Think of this partitioning as additional 'protective walls' between applications and user privilege levels to create an obstacle for bad actors."[22]

115.    However, even if the new hardware can protect against side channel attacks due to the Spectre vulnerabilities, the new "Cascade Lake" chip architecture for Xeon Scalable Processors will be prohibitively expensive for most consumers.

---

[21] https://newsroom.intel.com/editorials/advancing-security-silicon-level/  (Accessed 3/21/2018).
[22] *Id*.

## PARTIES

### Plaintiffs

116.     Plaintiff **Tyler Hadfield** is an individual citizen residing in **California**.  Plaintiff Hadfield purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Hadfield would not have purchased a computer with this CPU or paid the price that he did.

117.     Plaintiff **Laura Hutchins** is an individual citizen residing in **Colorado**.  Plaintiff Hutchins purchased a computer with an Intel CPU processor during the Class Period. She was unaware of the CPU defect described herein prior to her purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Hutchins would not have purchased a computer with this CPU or paid the price that she did.

118.     Plaintiff **Michael Hall** is an individual citizen residing in Bradenton, **Florida**. Plaintiff Hall purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Hall would not have purchased a computer with this CPU or paid the price that he did.

119.     Plaintiff **Aaron Meacham** is an individual citizen residing in **Idaho**.  Plaintiff Meacham purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Meacham would not have purchased a computer with this CPU or paid the price that he did.

120.     Plaintiff **Scott Giles** is an individual citizen residing in **Illinois**.  Plaintiff Giles purchased a computer with an Intel CPU processor during the Class Period. He was unaware of

the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Giles would not have purchased a computer with this CPU or paid the price that he did.

121.    Plaintiff **Greg Pulver** is an individual citizen residing in **Louisiana**. Plaintiff Pulver purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Pulver would not have purchased a computer with this CPU or paid the price that he did.

122.    Plaintiff **Joshua Minor** is a resident of **Louisiana**. Plaintiff Minor purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Minor would not have purchased a computer with this CPU or paid the price that he did.

123.    Plaintiff **Heidi Metzger** is an individual citizen residing in **Maine**. Plaintiff Metzger purchased a computer with an Intel CPU processor during the Class Period. She was unaware of the CPU defect described herein prior to her purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Metzger would not have purchased a computer with this CPU or paid the price that she did.

124.    Plaintiff **Howard Kramer** is an individual citizen residing in Marlborough, **Massachusetts** doing business under the name of **Howard Kramer Realty,** with a place of business located in Marlborough, Massachusetts. Plaintiff Kramer purchased Affected Products during the Class Period and currently uses the products to conduct his business. As a result of the CPU defect described herein, Kramer 's business data will be at risk until he implements the KPTI

fix. If Kramer chooses to implement the KPTI fix, his computer performance will decrease, negatively impacting Kramer 's business. Had Defendant disclosed such material facts, Kramer would not have purchased computers with this CPU or paid the price that he did.

125.    Plaintiff **Bottone/Reiling, P.C.** is a **Massachusetts** professional corporation with its principal place of business located in Boston, Massachusetts. Bottone/Reiling, P.C. purchased Affected Products during the Class Period and currently uses the products to conduct its business. As a result of the CPU defect described herein, Bottone/Reiling, P.C.'s business data will be at risk until it implements the KPTI fix. If Bottone/Reiling, P.C. chooses to implement the KPTI fix, its computer performance will decrease, negatively impacting Bottone/Reiling, P.C.'s business. Had Defendant disclosed such material facts, Bottone/Reiling, P.C. would not have purchased computers with this CPU or paid the price that it did.

126.    Plaintiff **Kevin Crawford** is a resident of **Montana**. Plaintiff Crawford purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Crawford would not have purchased a computer with this CPU or paid the price that he did.

127.    Plaintiff **Edward Sibert** is an individual citizen residing in **New York**. Plaintiff Sibert purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Sibert would not have purchased a computer with this CPU or paid the price that he did.

128.    Plaintiff **Angelo Pandazis** is a resident of **New Jersey**. Plaintiff Pandazis purchased a computer with an Intel CPU processor during the Class Period. He was unaware of

the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Pandazis would not have purchased a computer with this CPU or paid the price that he did.

129.    Plaintiff **Maria Enik** is a resident of **New Jersey**. Plaintiff Enik purchased a computer with an Intel CPU processor during the Class Period. She was unaware of the CPU defect described herein prior to her purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Enik would not have purchased a computer with this CPU or paid the price that she did.

130.    Plaintiff **George Apple** is an individual citizen residing in Sanford, **North Carolina**.  Plaintiff Apple purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Apple would not have purchased a computer with this CPU or paid the price that he did.

131.    Plaintiff  **Parker Banning** is an individual citizen residing in **Ohio**.  Plaintiff Banning purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Banning would not have purchased a computer with this CPU or paid the price that he did.

132.    Plaintiff **Robert S. Key** is an individual citizen residing in **Oregon**.  Plaintiff Key purchased a tablet computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Key would not have purchased a computer with this CPU or paid the price that he did.

133.    Plaintiff **Ashley Price** is a resident of **Pennsylvania**. Plaintiff Price purchased a computer with an Intel CPU processor during the Class Period. She was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Price would not have purchased a computer with this CPU or paid the price that he did.

134.    Plaintiff **Seren Alvarez** is an individual citizen residing in **Tennessee**. Plaintiff Alvarez purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Alvarez would not have purchased a computer with this CPU or paid the price that he did.

135.    Plaintiff **Ben Richardson** is an individual citizen residing in **Texas**. Plaintiff Richardson purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Richardson would not have purchased a computer with this CPU or paid the price that he did.

136.    Plaintiff **Aaron Grover** is an individual citizen residing in **Utah**. Plaintiff Grover purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant disclosed such material facts, Plaintiff Grover would not have purchased a computer with this CPU or paid the price that he did.

137.    Plaintiff **Martin Hall** is an individual citizen residing in Chesapeake, **Virginia**. Plaintiff Hall purchased a computer with an Intel CPU processor during the Class Period. He was unaware of the CPU defect described herein prior to his purchase of this computer. Had Defendant

disclosed such material facts, Plaintiff Hall would not have purchased a computer with this CPU or paid the price that he did.

**Defendant**

138.    Defendant Intel is a Delaware corporation with its principal place of business in California.  Defendant Intel may be served in Oregon through its registered agent for service of process, CT Corporation System, 780 Commercial Street SE, Suite 100, Salem, OR 97301-3645.

## JURISDICTION AND VENUE

139.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) and (b), in that Defendant Intel Corporation ("Intel") is a Delaware corporation, the Class members are citizens of every state in the United States and the amount in controversy is reasonably believed to exceed $5,000,000.00.

140.    Venue is proper in this District under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.  Furthermore, jurisdiction is proper in this Court under the doctrine of pendent jurisdiction for the other state law claims pursuant to 28 U.S.C. § 1367.

## CLASS ALLEGATIONS

141.    Plaintiffs bring this suit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all individuals and businesses in the United States who purchased an Intel CPU or computer containing an Intel CPU with the Defects from 2004 to the present (the "Class").

142.    Excluded from the Class is Defendant, any person, firm, trust, corporation, officer, director, or other individual or entity in which Defendant has a controlling interest or with which

Defendant is related to or affiliated, and the legal representatives, agents, heirs, affiliates, successors-in-interest or assigns of any excluded party.

143.    Plaintiffs reserve the right to amend or modify the Class definition in connection with a motion for class certification and/or the result of discovery.

144.    Plaintiffs also seek certification, to the extent necessary or appropriate, of state subclasses consisting of class members in the states in which Plaintiffs reside ("State Subclasses").

**Numerosity**

145.    The members of the Class and each State Subclass are so numerous that joinder of individual members is impracticable.  Each state contains hundreds of thousands or millions of CPUs and computers containing CPUs with the Defects.

146.    Plaintiffs do not anticipate any unusual difficulties in the management of this action as a class action. The Class and State Subclasses can be defined using objective criteria and have a well-defined community of interest in the questions of law and fact, since the rights of each Class and Subclass member were infringed or violated in similar fashion based upon Defendant's uniform misconduct.  Notice can be provided through third-party and OEM sales and warranty records and through publication.

**Commonality**

147.    Questions of law or fact common to the Class and Subclass members predominate over any questions affecting only individuals.  Among these predominant common questions of law and/or fact are the following:

a.   Whether Defendant's CPUs possess the Defects;

b.   Whether the Defects make computers susceptible to intrusion;

c.   Whether the Defects can be remedied without replacing the chips;

d. The effectiveness of software updates to remedy the Defects;

e. The effect of the software updates on the performance of the CPUs;

f. When Defendant knew, or should have known, about the Defects;

g. What obligations Defendant Had to disclose the Defects and whether it satisfied those obligations;

h. Whether the Defendant was negligent is designing the CPUs with the Defects;

i. Whether the Defendant made any express warranties concerning the CPUs which apply to the Defects;

j. Whether Defendant made any implied warranties concerning the CPUs which apply to the Defects;

k. Whether the Defendant is strictly liable for the Defects;

l. Whether a choice of law analysis permits the application of the law of a single jurisdiction or the laws of the states in which consumers reside or made their purchases;

m. Whether, with respect to the State Subclasses, the conduct of the Defendant violates the consumer protection statutes of the states in which the Plaintiffs reside;

n. The difference in value between a CPU or computer with and without the Defects;

o. The difference in value between a CPU encumbered by Defendant's software updates and one that is not; and

p. Whether injunctive relief is appropriate in the case and the form of such relief.

**Typicality**

148.    Plaintiffs' claims are typical of the claims of the Class and Subclasses of the states in which they reside.  The injuries sustained by Plaintiffs and the Class and Subclasses flow, in each instance, from a common nucleus of operative facts based on the Defendant's uniform conduct. The defenses, if any, that will be asserted against Plaintiffs' claims likely will be similar to the defenses that will be asserted, if any, against Class members' claims.

**Adequacy**

149.    Plaintiffs will fairly and adequately protect the interests of Class and Subclass members.  Plaintiffs have no interests materially adverse to or that irreconcilably conflict with the interests of Class or Subclass members and have retained counsel with significant experience in handling class actions and other complex litigation, and who will vigorously prosecute this action.

**Predominance**

150.    Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class and Subclasses.  No inquiry into the individual conduct of Class Members is necessary other than that needed to establish membership in the Class or Subclasses.  All that is required is a narrow focus on Defendant's conduct.

**Superiority**

151.    Pursuant to Rule 23(b) a class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

> a    The joinder of individual Class or Subclass members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.    The individual claims of members of the Class and Subclasses may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

c.    When Defendant's liability has been adjudicated, all consumers' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.    This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of claims;

e.    Plaintiffs know of no unusual difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.    This class action will assure uniformity of decisions among Class and Subclass members;

g.    The Class and Subclasses are readily definable based on objective criteria and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.    Class and Subclass members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

i.    It would be desirable to concentrate in this single venue the litigation of all consumers who were harmed by Defendant's conduct.

## INJUNCTIVE CLASS RELIEF

152.    Rules 23(b)(2) contemplates a class action for purposes of seeking class-wide injunctive relief.

153.    Here, the Defendant has engaged in class-wide conduct concerning the Defects. Since Defendant's conduct has been uniformly directed at all consumers in the United States, and the conduct continues presently, injunctive relief on a class-wide basis is a viable and suitable solution to remedy Defendant's continuing misconduct.

154.    The proposed Injunctive Class consists of all individuals and businesses in the United States who purchased an Intel CPU or computer containing an Intel CPU with the Defects from 2004 to the present (the "Injunctive Class").

155.    Plaintiffs and consumers do not know if they can rely on Intel's representations or CPUs in the future.

156.    The Injunctive Class is properly brought and should be maintained as a class action under Rule 23(a) and (b)(2).  The Injunctive Class satisfies the class action prerequisites of numerosity, commonality, typicality, and adequacy for the reasons stated above.

157.    A further common question exists for the Injunctive Class as to whether and to what extent Intel's conduct continues and whether consumers continue to suffer harm.

158.    The injunctive Class is properly brought and should be maintained as a class action under Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

159.    Plaintiffs seek injunctive relief on behalf of the Class Members on grounds generally applicable to the entire Injunctive Class and any final injunctive relief or declaratory relief would benefit the entire Injunctive Class.

## COUNT 1
### Strict Products Liability
### (On behalf of Plaintiffs and all Class Members)

160.    Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

161.    At all times relevant hereto, Defendant Intel designed, manufactured, advertised, promoted, distributed and supplied processors containing the Spectre and Meltdown Defects.

162.    Defendant Intel distributed, supplied, and sold those processors to device manufacturers for inclusion in computers, tablets, servers, and other computing products.

163.    Defendant Intel did so intending for such computing products to be sold or provided to individual and business users across the United States and around the world.

164.    Defendant's processors were unsafe for use due to the Defects in its design, which, via the Spectre and Meltdown Defects, exposed critical end-user data and systems to hackers and malware.

165.    The risks inherent in the processors' design significantly outweigh any benefits from their design.

166.    Named Plaintiffs, and the other Class members, would not have knowingly purchased a computer containing a processor with the Spectre and Meltdown Defects.

167.    The defective design of the Intel processors has damaged the named Plaintiffs and the other Class members in an amount to be proven at trial.

## COUNT 2
### Negligence
### (On behalf of Plaintiffs and all Class Members)

168.     Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

169.     Defendant owed Plaintiffs, and each of the Class members, a duty to exercise reasonable care in the design and manufacture of its processors, including a duty to ensure that the design of its processors did not expose critical end-user data and systems to intruders and malware.

170.     Defendant knew or should have known that its processors were subject to the Spectre and Meltdown Defects.

171.     Defendant's competitors have manufactured processors not subject to the Spectre and Meltdown Defects.

172.     Defendant was capable of manufacturing processors not subject to the Spectre and Meltdown Defects.

173.     The defective design of the Intel processors has damaged the named Plaintiffs and the other Class members in an amount to be proven at trial.

## COUNT 3
### Breach Of Implied Warranty Of Merchantability
### (On behalf of Plaintiffs and all Class Members)

174.     Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

175.     Defendant and its authorized agents and resellers or other sold Intel CPUs to Plaintiffs and Class members in the regular course of business.

176.     Defendant impliedly warranted to members of the general public, including Plaintiffs and Class members, these CPUs were of merchantable quality (i.e., a product of a high

enough quality to make it fit for sale, usable for the purpose it is made, of average worth in the marketplace, or not broken, unworkable, damaged, contaminated or flawed), was of the same quality as those generally acceptable in the trade or that would pass without objection in the trade, were free from material Defects and were reasonably fit for the ordinary purposes for which they were intended or used. In addition, Defendant either was or should have been aware of the particular purposes for which such CPUs are used, and that Plaintiffs and the

177.    Class members were relying on the skill and judgment of Defendant to furnish suitable goods for such purpose.

178.    Plaintiffs and Class members are third-party beneficiaries of, and substantially benefited from, such contracts among Defendant and its authorized agents and resellers.

179.    Defendant breached its implied warranties by selling Plaintiffs and Class members defective Intel CPUs. The Defect renders the Intel CPUs unmerchantable. Defendant has refused to recall, repair or replace, free of charge, all Intel CPUs or any of their defective component parts or refund the prices paid for such CPUs.

180.    The Defect in the Intel CPUs existed when the CPUs left Defendant's and their authorized agents' and retail sellers' possession and thus is inherent in such CPUs.

181.    As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiffs and Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale in terms of the difference between the value of the CPUs as warranted and the value of the CPUs as delivered. Additionally, Plaintiffs and Class members either have or will incur economic, incidental and consequential damages in the cost of repair or replacement and costs of complying with continued contractual obligations as well as the cost of

buying an additional CPU they would not have purchased had the CPUs in question not contained the non-repairable Defect.

182.    Intel's breach of warranty has damaged the named Plaintiffs and the other class members in an amount to be proven at trial.

## COUNT 4
### Violation Of The Magnuson-Moss Warranty Act
### (On behalf of Plaintiffs and all Class Members)

183.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

184.    The Magnuson-Moss Warranty Act provides a federal remedy for consumers who have been damaged by the failure of a supplier or warrantor to comply with any obligation under a written warranty or implied warranty, or other various obligations established under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq.

185.    An implied warranty of merchantability arose in connection with the purchases of the Product by Plaintiffs by operation of state law under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

186.    The Product is a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

187.    Plaintiffs and other members of the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

188.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4) & 2301(5).

189.    Defendant breached its implied warranty of merchantability by selling Plaintiffs and Class members defective Intel CPU and thereby violated the Magnuson-Moss Warranty Act.

190.    Consequently, Plaintiffs and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial, along with attorney's fees and costs.

**COUNT 5**
**Unjust Enrichment**
**(On behalf of Plaintiffs and all Class Members)**

191.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

192.    Defendant, through misleading representations and omissions, enticed Plaintiffs and members of the Class to purchase the Products.

193.    Plaintiffs and the Class members conferred a benefit on Defendant by purchasing the Products.

194.    By its wrongful acts, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

195.    Defendant benefitted financially from the revenues and other compensation tied to the sale of the Products, which was unjust in light of Defendant's wrongful conduct.

196.    Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits it received from Plaintiffs and the Class as the result of its deceptive marketing and advertising practices.

197.    Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiffs and the Class members is unjust and inequitable, Plaintiffs seek restitution from, and an order from the Court disgorging all profits, benefits and other compensation obtained by Defendant due to its wrongful conduct.

**CALIFORNIA: Counts 6 – 12**

**COUNT 6**

**California Legal Remedies Act, California Civil Code § 1750 et seq.**
**(On behalf of Plaintiff Tyler Hadfield and California Class Members)**

198.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

199.    Plaintiff asserts this claim individually and on behalf of all California class members.

200.    The Consumers Legal Remedies Act ("CLRA") was enacted to protect consumers against unfair and deceptive business practices. The CLRA applies to Defendant's acts and practices because it covers transactions involving the sale of goods to California consumers.

201.    The Intel processors are "goods" under California Civil Code §1761(a).

202.    Intel is a "person" under California Civil Code §1761(c).

203.    Plaintiff and the Class members are "consumers" under California Civil Code § 1761(d).

204.    Plaintiff and Class members engaged in "transactions" under California Civil Code §1761(e), including the purchase of Intel processors and the presentation of Intel CPUs for repair or replacement of the Defect. Intel's unfair and deceptive business practices were intended and did result in the sale of Intel processors, a defective consumer product.

205.    Defendant's Intel CPUs failed to perform in accordance with their expected characteristics, uses and benefits.

206.    Defendant had exclusive knowledge of material facts, i.e. the Intel processors were defective, unknown to Plaintiff and Class members. If Plaintiff and Class members had known of the Defects in the Intel processors, they would not have purchased the processors at the prices they did, if at all.

207.    Defendant had a duty to disclose the Defects in the Affected Products for various reasons, including:

      a.      Intel had exclusive knowledge of the Defects and other material facts not known to Plaintiff or the Class; and

      b.      Intel actively concealed these material facts from Plaintiff and the Class.

208.    Defendant engaged in unfair and deceptive practices by misrepresenting or not disclosing the above material facts from Plaintiff and the Class, in violation of Cal. Civ. Code § 1770(a)(5), (7), (14) and (16).

209.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class members suffered injury. Plaintiff and Class members are entitled to injunctive relief, court costs and attorney fees, and other relief the Court deems proper.

210.    At this time, Plaintiff only seeks injunctive relief and do not seek an award of damages under the CLRA.

211.    Pursuant to California Civil Code § 1782(a), Plaintiff Hadfield sent Defendant a CLRA notice letter via certified mail, return receipt requested, which was delivered on a date prior to the filing of this complaint, advising Defendant that it is in violation of the CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770.

212.    At this time Plaintiff is not seeking damages under the CLRA.  However, if Defendant does not take remedial action or respond to Plaintiff's letter appropriately within thirty days, Plaintiff will amend this complaint to assert a claim for damages under the CLRA.

## COUNT 7
## California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*
## (On behalf of Plaintiff Tyler Hadfield and California Class Members)

213.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

214.    Plaintiff asserts this claim individually and on behalf of all California Class members.

215.    Defendant's business acts and practices complained of were centered in, carried out, effectuated and perfected within or had their effect in the State of California, and injured Plaintiff and all Class members.

216.    Beginning as early as 2008, and continuing thereafter at least up through and including the date of filing this Complaint, Defendant committed acts of unfair competition, as defined by §17200, et seq., of the California Business and Professions Code, by engaging in the acts and practices specified above.

217.    This claim is brought pursuant to §§17203 and 17204 of the California Business and Professions Code to obtain equitable monetary and injunctive relief from Defendant for acts and practices as alleged herein that violated §17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

218.    Defendant's conduct as alleged herein violated §17200. The acts, omissions, practices and non-disclosures of Defendant constituted a common continuous course of conduct of unfair competition by means of the commission of unfair and unlawful business acts or practices within the meaning of California Business and Professions Code, §17200, et seq.

219.    Defendant engaged in "unlawful" business acts and practices by:

    a       breaching implied warranties; and

   b.  violating the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*

220. Defendant engaged in "unfair" business acts and practices by, among other things:

   a.  engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiff and the Class considering the reasonably available alternatives, based on legislatively declared policies not to sell defective products in the market without providing an adequate remedy therefor;

   b.  engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the Class; and

   c.  engaging in unfair business practices by refusing to repair or recall the defective Intel processors or providing compensation therefor.

221. Specifically, Defendant engaged in "unfair" business acts and practices by selling the Intel processors knowing or being aware the processors contained a critical security Defects where the software patch would degrade the processors performance.  Defendant also engaged in unfair business acts and practices by making express and implied warranties, which it refuses to honor.

222. As such conduct is or may well be continuing and on-going, Plaintiff and each of the Class members are entitled to injunctive relief to prohibit or correct such on-going acts of unfair competition, in addition to obtaining equitable monetary relief.

223. Plaintiff and Class members used Defendant's products and had business dealings with Defendant either directly or indirectly as described above. The acts and practices of Defendant have caused Plaintiff and Class members to lose money and property by being overcharged for

and paying for the defective processors at issue, or being required to purchase an additional working processor. Such loss was the result of the above acts of unfair competition and Defendant's misconduct in violation of the state laws set forth above. Plaintiff is therefore entitled to seek recovery of such amounts. Such injury occurred at the time such monies were paid. Plaintiff has thus each suffered injury in fact and lost money or property as a result of such acts and practices as set forth in detail above.

224.    Defendant has unjustly benefited as a result of its wrongful conduct and its acts of unfair competition. Plaintiff and Class members are accordingly entitled to equitable relief including restitution and/or restitutionary disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business acts and practices, pursuant to California Business and Professions Code §§17203 and 17204, as well as attorneys' fees and costs pursuant to, among others, California Code of Civil Procedure § 1021.5.

## COUNT 8
### California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*
### (On behalf of Plaintiff Tyler Hadfield and California Class Members)

225.    Plaintiff and the California Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

226.    Plaintiff asserts this claim individually and on behalf of all California Class members.

227.    California Bus. & Prof. Code § 17500 states: "It is unlawful for any…corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause To be made or disseminated … from this state before the public in any state, in any newspaper or other

publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

228.    Intel caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Intel, to be untrue and misleading to consumers, including Plaintiff and the other Class members.

229.    Intel has violated § 17500 because the misrepresentations and omissions regarding the security and performance of the Affected Products as set forth in this Complaint were material and likely to deceive a reasonable consumer.  Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of Intel's unfair, unlawful, and/or deceptive practices.

230.     In purchasing or leasing the Affected Products, Plaintiff and the other Class members relied on the misrepresentations and/or omissions of Intel with respect to the security and performance of the Affected Products. Intel's representations turned out not to be true because the Affected Products are distributed with serious security flaws which render them vulnerable to exploit by unauthorized access or intrusion.

231.    Had Plaintiffs and the other Class members known this, they would not have purchased their Affected Products and/or paid as much for them. Accordingly, Plaintiff and the other Class members overpaid for their processors and did not receive the benefit of their bargain.

232.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Intel's business. Intel's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

233.    Plaintiff, individually and on behalf of the other Class members, requests that this Court enter such orders or judgments as may be necessary to enjoin Intel from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the other Class members any money Intel acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief as appropriate.

**COUNT 9**
**Breach Of Express Warranty, Cal. Com. Code §§ 2313 and 10210**
**(On behalf of Plaintiff Tyler Hadfield and California Class Members)**

234.    Plaintiff and the California Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

235.    Plaintiff asserts this claim individually and on behalf of all California Class members.

236.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Affected Products under § 2103(1)(d).

237.    The Affected Products are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

238.    Intel marketed and advertised the Affected Products as secure.    Such representations formed a basis of the bargain that was reached when Plaintiffs and other California Class members purchased the Affected Products.

239.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access or intrusion.

240.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

241.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by cybersecurity experts or prior to experiencing a known security hack resulting from the Defects.

242.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

243.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

244.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

245.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

246.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing

customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

247.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

248.    Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

249.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the California Class have been damaged in an amount to be determined at trial.

### COUNT 10
### Breach Of Implied Warranty Of Merchantability, Cal. Com. Code §§ 2314, 10212
### (On Behalf of Plaintiff Tyler Hadfield and California Class Members)

250.    Plaintiff and the California Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

251.    Plaintiff asserts this claim individually and on behalf of all California Class members.

252.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Affected Products under § 2103(1)(d).

253.    The Affected Products are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

254.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

255.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

256.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

257.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

258.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other California Class members have been damaged in an amount to be proven at trial.

## COUNT 11
### Song-Beverly Consumer Warranty Act – Express Warranties
### Cal. Civ. Code §§ 1791.2 & 1793.2(d)
### (On behalf of Plaintiff Tyler Hadfield and California Class Members)

259.    Plaintiff and the California Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

260. Plaintiff asserts this claim individually and on behalf of all California Class members.

261. Plaintiff and the other Class members who purchased the Affected Products in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

262. The Affected Products are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

263. Intel is a "manufacturer" of the Affected Products within the meaning of Cal. Civ. Code § 1791(j).

264. Plaintiff and the other Class members bought new processors manufactured by Intel.

265. Intel made express warranties to Plaintiff and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

266. Intel marketed and advertised the Affected Products as secure. Such representations formed a basis of the bargain that was reached when Plaintiffs and other California Class members purchased the Affected Products.

267. However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

268. Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

269.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by information security experts or prior to experiencing a known security hack resulting from the Defects.

270.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

271.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

272.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

273.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

274.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which

unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

275. Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

276. Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

277. As a result of the Intel's breach of its express warranties, Plaintiff and the other Class members received goods whose condition substantially impairs their value to Plaintiffs and the other Class members. Plaintiffs and the other Class members have been damaged as a result of the diminished value of the Intel products, the products' malfunctioning, and the nonuse of their processors.

278. Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Affected Products, or the overpayment or diminution in value of their Affected Products.

279. Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

## COUNT 12
### Song-Beverly Consumer Warranty Act – Implied Warranty Of Merchantability
### Cal. Civ. Code §§ 1791.1 and 1792
### (On Behalf of Plaintiff Tyler Hadfield and California Class Members)

280. Plaintiff and the California Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

281. Plaintiff asserts this claim individually and on behalf of all California Class members.

282. Plaintiff and the other Class members who purchased the Affected Products in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

283. The Affected Products are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

284. Intel is a "manufacturer" of the Affected Products within the meaning of Cal. Civ. Code § 1791(j).

285. Intel impliedly warranted to Plaintiff and the other Class members that its processors were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792, however, the Affected Products do not have the quality that a buyer would reasonably expect.

286. Defendant has breached implied warranties because the Intel processors sold to Plaintiff and Class members were not merchantable and were not fit for the ordinary and particular purposes for which such goods are used in that the processors suffer from critical security Defects, requiring a software patch that will degrade the performance of the processors. It is not necessary for Plaintiffs to prove the cause of the Defects in the processors, but only that the processors did not conform to the applicable warranties.

287. As a direct and proximate cause of Intel's breach of the Song-Beverly Consumer Warranty Act, Plaintiff and Class members sustained damages and other losses in an amount to be

determined at trial, entitling them to compensatory damages, consequential damages, statutory damages and civil penalties, diminution in value, costs, attorneys' fees and interest, as applicable.

**COLORADO – Counts 13 – 14**

**COUNT 13**

**Colorado Consumer Protection Act, C.R.S. §§ 6-1-101 *et seq.***
**(On Behalf of Plaintiff Laura Hutchins and Colorado Class Members)**

288.    Plaintiff and Colorado Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

289.    Plaintiff asserts this claim individually and on behalf of all Colorado Class members.

290.    The Colorado Consumer Protection Act ("CCPA") prohibits, among other things, "[r]epresenting that goods, food, services, or property are of a particular standard, quality, or grade, or that goods, are of a particular style or model, if he knows or should know that they are of another. C.R.S. § 6-1-105.

291.    The acts and omissions prohibited by the CCPA are in addition to unfair trade practices actionable at common law or under other statutes of the state.  C.R.S. § 6-1-105.

292.    Defendant is engaged in the marketing, manufacturing, and distribution of Affected Products in Colorado.

293.    The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of CCPA. As such, Plaintiff and the Colorado Class Members seek monetary damages and the entry of preliminary and permanent injunctive relief against Defendant, enjoining it from inaccurately describing, labeling, marketing, and promoting the Affected Products.

294.    Defendant's willful and knowing material misrepresentations regarding the quality of the Affected Products induced Plaintiff and Class Members to pay a premium for the Affected Products they would not have had they known about the Spectre and Meltdown Defects.

295.    Plaintiff and Colorado Class Members relied on Defendant's representations regarding the quality of Affected Products.

296.    Defendant continues to market Affected Products as having a level of security and performance that they do not have because of the Spectre and Meltdown Defects and the subsequent problematic and insufficient patches.

297.    During all times relevant to this cause of action, Defendant's competitors produced similar products that did not contain the Spectre and Meltdown Defects.

298.    As a proximate result of Defendant's conduct, Plaintiff and Class members have been exposed to serious vulnerabilities to exploit by unauthorized access, intrusion, or otherwise, lost performance, and loss in value of Affected Products.

299.    Due to Defendant's "unlawful" deceptive and unfair actions, Plaintiff and Class Members are entitled to monetary, compensatory, and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## COUNT 14
### Implied Warranty Of Merchantability, Col. Rev. Stat. §§ 4-2-313 and 4-2.5-212
### (On Behalf of Plaintiff Laura Hutchins and Colorado Class Members)

300.    Plaintiff and Colorado Class Members re-allege and incorporate the preceding paragraphs as if fully set forth herein.

301.    Plaintiff asserts this claim individually and on behalf of all Colorado Class members.

302. Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of the Affected Products under § 4-2-103(1)(d).

303. The Affected Products are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

304. A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors s are used is implied by law pursuant to Colo. Rev. Stat. § § 4- 3.2-313 and 4-2.5-212).

305. The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used. Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

306. Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

307. As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Colorado Class members have been damaged in an amount to be proven at trial.

## COUNT 15
### Breach of Express Warranty, Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210
### (On Behalf of Plaintiff Laura Hutchins and Colorado Class Members)

308. Plaintiff and Colorado Class Members re-allege and incorporate the preceding paragraphs as if fully set forth herein.

309.    Plaintiff asserts this claim individually and on behalf of all Colorado Class members.

310.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of the Affected Products under § 4-2-103(1)(d).

311.    The Affected Products are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

312.    Intel marketed and advertised the Affected Products as secure. Such representations formed a basis of the bargain that was reached when Plaintiffs and other Colorado Class members purchased the Affected Products.

313.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

314.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

315.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by information security experts or prior to experiencing a known security hack resulting from the Defects.

316.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

317.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

318.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

319.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

320.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

321.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

322.    Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

323.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Colorado Class have been damaged in an amount to be determined at trial.

**FLORIDA – Counts 16 – 18**

**COUNT 16**
**Florida Deceptive And Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.***
**(On Behalf of Plaintiff Michael Hall and Florida Class Members)**

324.    Plaintiff and Florida Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

325.    Plaintiff asserts this claim individually and on behalf of all Class Florida members.

326.    Plaintiff and Class Members bring this action pursuant to Florida Statues, sections 501.201 –501.213, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

327.    FDUTPA "shall be construed liberally to promote the following policies: (1) To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices; (2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competitions, or unconscionable, deceptive, or unfair acts or practices, in the conduct of any trade or commerce; [and] (3) To make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protections. Fla. Stat. § 501.202(2).

328.    FDUPTA prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

329.     At all times relevant to this cause of action, Defendant marketed, advertised, manufactured and/or distributed Affected Products with Intel CPUs containing the Spectre and/or Meltdown Defects.

330.     Defendant falsely represented the quality, performance, and security of Affected Products to Plaintiff and Class Members.

331.     Defendant's advertising failed to disclose the known Spectre and Meltdown Defects in the Affected Products.

332.     Plaintiff and the Florida Class Members relied on Defendant's misrepresentations and were injured thereby.

333.     Defendant's advertising induced Plaintiff and Florida Class Members to purchase the Affected Products.

334.     Defendant made its untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

335.     Defendant's acts and omissions were material to reasonable consumers' expectations about the quality and security of the Affected Products.

336.     As a result of Defendant's "unlawful" deceptive conduct, Plaintiff and Florida Class members were injured in that they paid a premium for products they would not have had they been made aware of the defect; were exposed to serious security vulnerability; and lost productivity due to the substantial decrease in processor performance following the patch.

337.     Plaintiff and Florida Class Members are entitled to monetary, compensatory, treble, and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**COUNT 17**
**Express Warranty, Fla. Stat. §§ 672.313 and 680.21**
**(On Behalf of Plaintiff Michael Hall and Florida Class Members)**

338.    Plaintiff and the Florida Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

339.    Plaintiff asserts this claim individually and on behalf of all Florida Class members.

340.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of the Affected Products under §§ 672.103(1)(d) and 680.1031(3)(r).

341.    The Affected Products are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

342.    Intel marketed and advertised the Affected Products as secure.    Such representations formed a basis of the bargain that was reached when Plaintiffs and other Florida Class members purchased the Affected Products.

343.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

344.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

345.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by cybersecurity experts or prior to experiencing a known security hack resulting from the Defects.

346.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its

processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

347.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

348.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

349.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

350.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

351.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

352.    Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

353.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Florida Class have been damaged in an amount to be determined at trial.

## COUNT 18
### Implied Warranty Of Merchantability, Fla .Stat. §§ 672.314 and 680.212
### (On Behalf of Plaintiff Michael Hall and Florida Class Members)

354.    Plaintiff and the Florida Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

355.    Plaintiff asserts this claim individually and on behalf of all Florida Class members.

356.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Flat. Stat. § 672.104(1) and a "seller" of the Affected Products under §§ 672.103(d) and 680.1031(3)(r).

357.    The Affected Products are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 680.1031(1)(p) and 680.1031(z)(2)(e).

358.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant Florida's statutes.

359.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

360.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to vulnerable to exploit by unauthorized access, intrusion, or otherwise.

361.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

362.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other California Class members have been damaged in an amount to be proven at trial.

**IDAHO – Counts 19-21**

**COUNT 19**

**Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.***
**(On Behalf of Plaintiff Aaron Meacham and Idaho Class Members)**

363.    Plaintiff and the Idaho Class re-allege and incorporate the preceding paragraphs as if fully set forth herein

364.    Plaintiff asserts this claim individually and on behalf of all Class members.

365.    Defendant is a "person" under the Idaho Consumer Protection Act ("Idaho CPA"), Idaho Code § 48-602(1).

366.    Defendant's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code § 48-602(2).  Defendant participated in misleading, false, or deceptive acts that violated the Idaho CPA.

367.    In the course of their business, Defendant concealed and suppressed material facts concerning the Affected Products.

368.     Plaintiff and Idaho Class members had no way of discerning that Intel's representations were false and misleading because the Defects in the Affected Products are highly technical and hard for a non-expert to identify and measure. Plaintiff and Idaho Class members did not and could not unravel Intel's deception on their own.

369.     Defendant thus violated the Act by, at minimum: (1) representing that the Class processors have characteristics, uses, and benefits which they do not have; (2) representing that the processors are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Products with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce. Idaho Code 17§ 48-603.

370.     In the course of its business, Intel willfully failed to disclose and actively concealed the processor Defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Intel also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Products.

371.     Intel intentionally and knowingly misrepresented material facts regarding the Affected Products with intent to mislead Plaintiff and the Idaho Class.

372.     Intel knew or should have known that its conduct violated the Idaho CPA.

373.     Defendant owed Plaintiff a duty to disclose the Defects in the Affected Products because it:

  a.  possessed exclusive knowledge that they were manufacturing, selling, and distributing Affected throughout the United States that were affected by serious security Defects ;

  b.  intentionally concealed the foregoing from Plaintiff and Class members.

374. The Defects in the processors, and Intel's concealment of those Defects, was and is material to Plaintiff and the Idaho Class.

375. Defendant' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, regarding the true quality and security of the Affected Products.

376. Plaintiff and the Idaho Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Idaho Class members who purchased the Affected Products would not have purchased at all and/or—if the processors' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of their processors, as well as lost or diminished use.

377. Defendant has an ongoing duty to all Intel customers to refrain from unfair and deceptive practices under the Idaho CPA. All owners of Affected Products suffered ascertainable loss in the form of the diminished value of their processors as a result of Intel's deceptive and unfair acts and practices made in the course of Intel's business.

378. Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

379. As a direct and proximate result of Defendant' violations of the Idaho CPA, Plaintiffs and the Idaho Class have suffered injury-in-fact and/or actual damage.

380.    Pursuant to Idaho Code § 48-608, Plaintiffs and the Idaho Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Plaintiff and each Idaho Class member.

381.    Plaintiff also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

## COUNT 20
### Express Warranty, Idaho Code §§ 28-2-313 and 28-12-210
### (On Behalf of Plaintiff Aaron Meacham and Idaho Class Members)

382.    Plaintiff and the Idaho Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

383.    Plaintiff asserts this claim individually and on behalf of Idaho Class members.

384.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and a "seller" of the Affected Products under § 28-2-103(1)(d).

385.    The Affected Products are and were at all relevant times "goods" within the meaning Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

386.    Intel marketed and advertised the Affected Products as secure.    Such representations formed a basis of the bargain that was reached when Plaintiffs and other Idaho Class members purchased the Affected Products.

387.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to vulnerable to exploit by unauthorized access, intrusion, or otherwise.

388.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

389.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by cybersecurity experts or prior to experiencing a known security hack resulting from the Defects.

390.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

391.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

392.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

393.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

394.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing

customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

395.     Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

396.     Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

397.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Idaho Class have been damaged in an amount to be determined at trial.

## COUNT 21
## Implied Warranty Of Merchantability
## Idaho Code §§ 28-2-314 and 28-12-212
## (On Behalf of Plaintiff Aaron Meacham and Idaho Class Members)

398.     Plaintiff and the Idaho Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

399.     Plaintiff asserts this claim individually and on behalf of Idaho Class members.

400.     Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and a "seller" of motor the Affected Products under § 28-2-103(1)(d).

401.    The Affected Products are and were at all relevant times "goods" within the meaning of §§ 28-2-105(1) and 28-12-103(1)(h).

402.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which Processors are used is implied by law pursuant to Idaho Code §§ 28-2 314 and 28-12-212.

403.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

404.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

405.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

406.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Idaho Class members have been damaged in an amount to be proven at trial.

**ILLINOIS – Counts 22 – 24**

**COUNT 22**

**ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT, § 815 ILCS 505**
**(On Behalf of Plaintiff Scott Giles and Illinois Class Members)**

407.    Plaintiff and Illinois Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

408.    Plaintiff asserts this claim individually and on behalf of Illinois Class members.

409.    Through their conduct and omissions, Defendant has violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), § 815 ILCS 505/1, et seq.

410.    Section 2 of the ICFA, 815 ILCS 505/2, provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practices described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

411.    Section 10a of the ICFA, 815 ILCS 505/10A, provides in relevant part:

(a) Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper    .    .    . * * *
(c) Except as provided in subsections (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

412.    Plaintiff and other Illinois Class members are "consumers" or "persons," as defined under the ICFA, § 815 ILCS 505/1 *et seq.*

413.    Defendant's conduct alleged in this complaint occurred in the course of trade and commerce.

414.    Intel's unfair and deceptive business practices were intended and did result in the sale of Intel processors, a defective consumer product.

415.   Defendant's Intel processors failed to perform in accordance with their expected characteristics, uses, and benefits.

416.   Defendant had exclusive knowledge of material facts, i.e. the Intel processors were defective, unknown to Plaintiff and Class members.

417.   Defendant had a duty to disclose the Defects in the Intel processors for various reasons, including that Intel had exclusive knowledge of the Defects and other material facts not known to Plaintiff or the Class, and Intel actively concealed a material fact from Plaintiff and the Class.

418.    Defendant engaged in unfair and deceptive practices by misrepresenting or not disclosing the above material facts from Plaintiff and the Class.

419.   The omission of this material fact was likely to mislead consumers and, in fact, did mislead them.

420.   Defendant made these omissions with the intent that Class members would rely on the information provided, and omitted the material fact of the Defects in the Intel processors.

421.    Had Defendant not engaged in the deceptive omission of the material fact described above, Plaintiff and Class members would not have purchased the processors s at the prices they did, if at all.

422.   As a direct and proximate result of Defendant's conduct, Class members have suffered actual damages.

**COUNT 23**

**Express Warranty, 810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210**
**(On Behalf of Plaintiff Scott Giles and Illinois Class Members)**

423.    Plaintiff and the Illinois Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

424.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of the Affected Products under § 5/2-103(1)(d).

425.    The Affected Products are and were at all relevant times "goods" within the meaning of Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

426.    Intel marketed and advertised the Affected Products as secure.    Such representations formed a basis of the bargain that was reached when Plaintiffs and other Illinois Class members purchased the Affected Products.

427.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

428.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

429.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by cybersecurity experts or prior to experiencing a known security hack resulting from the Defects.

430.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its

processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

431.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

432.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

433.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

434.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

435.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

436.    Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

437.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Illinois Class have been damaged in an amount to be determined at trial.

### COUNT 24
**Implied Warranty Of Merchantability, 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212**
**(On Behalf of Plaintiff Scott Giles and Illinois Class Members)**

438.    Plaintiff and the California Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

439.    Plaintiff asserts this claim individually and on behalf of Illinois Class members.

440.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of the Affected Products under § 5/2-103(1)(d).

441.    The Affected Products are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

442.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

443.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

444.     Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

445.     Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

446.     As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**LOUISIANA – Counts 25 – 26**

**COUNT 25**

**Unfair Trade Practices & Consumer Protection Law , La. Rev. Stat. § 51:1401, *et seq.***
**(On Behalf of Plaintiffs Joshua Minor, Greg Pulver, and Louisiana Class Members)**

447.     Plaintiffs and the Louisiana Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

448.     Plaintiffs assert this claim individually and on behalf of Louisiana Class members.

449.     The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A).

450.     Intel participated in misleading, false, or deceptive acts that violated the Louisiana CPL.

451.     Defendant, Plaintiffs, and the Louisiana Class are "persons" within the meaning of La. Rev. Stat. § 51:1402(8).

452.    Plaintiffs and the Louisiana Class are "consumers" within the meaning of La. Rev. 17 Stat. § 51:1402(1).

453.    Intel engaged in "trade" or "commerce" within the meaning of La. Rev. 19 Stat. § 51:1402(10).

454.    In the course of their business, Defendant concealed and suppressed material facts concerning the Affected Products.

455.    Plaintiff and Louisiana Class members had no way of discerning that Intel's representations were false and misleading because the Defects in the Affected Products are highly technical and hard for a non-expert to identify and measure. Plaintiff    and    Louisiana    Class members did not and could not unravel Intel's deception on their own.

456.    Defendant thus violated the Act by, at minimum marketing its processors as secure, and by presenting itself as a reputable manufacturer that valued privacy and security and stood behind its processors after they were sold, Intel engaged in deceptive business practices prohibited by the Louisiana CPL.

457.    In the course of its business, Intel willfully failed to disclose and actively concealed the processor Defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Intel also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Products.

458.    Intel intentionally and knowingly misrepresented material facts regarding the Affected Products with intent to mislead Plaintiff and the Louisiana Class.

459.    Intel knew or should have known that its conduct violated the Louisiana CPL.

460.    Defendant owed Plaintiff a duty to disclose the Defects in the Affected Products because it:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing Affected throughout the United States that were affected by serious security Defects ;

b.    intentionally concealed the foregoing from, Plaintiff and Class members.

461.    The presence of the Spectre and Meltdown Defects in the processors and Intel's concealment of those Defects was material to Plaintiff and the Louisiana Class.

462.    Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true quality and security of the Affected Products.

463.    Plaintiff and the Louisiana Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant' misrepresentations and its concealment of and  failure to disclose material information.  Plaintiff and the Louisiana Class members who purchased the Affected Products would not have purchased at all and/or—if the processors' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of their processors, as well as lost or diminished use.

464.    Defendant has an ongoing duty to all Intel customers to refrain from unfair and deceptive practices under the Louisiana CPL. All owners of Affected Products suffered ascertainable loss in the form of the diminished value of their processors as a result of Intel's deceptive and unfair acts and practices made in the course of Intel's business.

465.    Defendant's violations present a continuing risk to Plaintiff as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

466.     As a direct and proximate result of Defendant' violations of the Louisiana CPL, Plaintiffs and the Louisiana Class have suffered injury-in-fact and/or actual damage.

467.     Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs and the Louisiana Class seek to recover actual damages in an amount to be determined at trial; treble damages for Intel's knowing violations of the Louisiana CPL; an order enjoining Intel's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under and in accordance with the Louisiana CPL.

### COUNT 26
**Implied Warranty Of Merchantability and Warranty Against Redhibitory Defects**
**La. Civ. Code Art. 2520, 2524**
**(On Behalf of Plaintiffs Joshua Minor, Greg Pulver, and Louisiana Class Members)**

468.     Plaintiffs and the Louisiana Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

469.     Plaintiffs assert this claim individually and on behalf of Louisiana Class members.

470.     Intel is and was at all relevant times a merchant with respect to the Affected Products.

471.     A warranty that the Affected Products were in merchantable condition is implied by law in the instant transactions. These Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.

472.     Specifically, the Affected Products are inherently defective in that they are subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

473.     Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and

communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

474.    As a direct and proximate result of Intel's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**MAINE – Counts 27 – 29**

**COUNT 27**

**Unfair Trade Practices Act, Me. Rev. Stat. Ann. Tit. 5 § 205-a,** *et seq.*
**(On Behalf of Plaintiff Heidi Metzger and Maine Class Members)**

475.    Plaintiff and the Maine Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

476.    Plaintiff asserts this claim individually and on behalf of Maine Class members.

477.    The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."  Me. Rev. Stat. Ann. Tit. 5 § 207.

478.    Defendant, Plaintiffs, and the Maine Class are "persons" within the meaning of Me. Rev. Stat. Ann. Tit. 5, § 206(2).

479.    Intel is engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. Tit. 5, § 206(3).

480.    In the course of their business, Defendant concealed and suppressed material facts concerning the Affected Products.

481.    Plaintiff and Maine Class members had no way of discerning that Intel's representations were false and misleading because the Defects in the Affected Products are highly

technical and hard for a non-expert to identify and measure. Plaintiff and Maine Class members did not and could not unravel Intel's deception on their own.

482.    Defendant thus violated the Act by, at minimum marketing its processors as secure, and by presenting itself as a reputable manufacturer that valued privacy and security and stood behind its processors after they were sold, Intel engaged in deceptive business practices prohibited by the Maine UTPA.

483.    In the course of its business, Intel willfully failed to disclose and actively concealed the processor Defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Intel also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Products.

484.    Intel intentionally and knowingly misrepresented material facts regarding the Affected Products with intent to mislead Plaintiff and the Maine Class.

485.    Intel knew or should have known that its conduct violated the Maine UTPA.

486.    Defendant owed Plaintiff a duty to disclose the Defects in the Affected Products because it:

> a.      possessed exclusive knowledge that they were manufacturing, selling, and distributing Affected throughout the United States that were affected by serious security Defects ;
>
> b.      intentionally concealed the foregoing from, Plaintiff and Class members.

487.    The presence of the Spectre and Meltdown Defects in the processors and Intel's concealment of those Defects was material to Plaintiff and the Maine Class.

488.    Defendant's unfair or deceptive acts or practices were likely to and did in fac deceive reasonable consumers, including Plaintiff, about the true quality and security of the Affected Products.

489.    Plaintiff and the Maine Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant' misrepresentations and its concealment of and   failure to disclose material information.   Plaintiff and the Maine Class members who purchased the Affected Products would not have purchased at all and/or—if the processors' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of their processors, as well as lost or diminished use.

490.    Defendant has an ongoing duty to all Intel customers to refrain from unfair and deceptive practices under the Maine UTPA. All owners of Affected Products suffered ascertainable loss in the form of the diminished value of their processors as a result of Intel's deceptive and unfair acts and practices made in the course of Intel's business.

491.    Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

492.    As a direct and proximate result of Defendant's violations of the Maine UTPA, Plaintiff and the Maine Class have suffered injury-in-fact and/or actual damage.

493.    Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, Plaintiffs and the Maine Class seek to recover actual damages in an amount to be determined at trial; treble damages for Intel's knowing violations of the Maine UTPA; an order enjoining Intel's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under applicable law.

494.     On March 26 Plaintiff sent a letter complying with Me. Rev. Stat. Ann. Tit. 5, § 213(1-A).  Because Intel failed to remedy its unlawful conduct within requisite time period, Plaintiffs seek all damages and relief to which Plaintiff and the Maine Class are entitled.

## COUNT 28
## BREACH OF EXPRESS WARRANTY
## (Me. Rev. Stat. Tit. 11 §§ 2-313 and 2-1210)
## (On Behalf of Plaintiff Heidi Metzger and Maine Class Members)

495.     Plaintiff and the Maine Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

496.     Plaintiff asserts this claim individually and on behalf of Maine Class members.

497.     Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Me. Rev. Stat. Ann. Tit. 11, §§ 2-104(1) and 2-1103(3), and a "seller" of the Affected Products under § 2-103(1)(d).

498.     The Affected Products are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11, §§ 2-105(1), and 2-1103(1)(h).

499.     Intel marketed and advertised the Affected Products as secure.  Such representations formed a basis of the bargain that was reached when Plaintiffs and other Maine Class members purchased the Affected Products.

500.     However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

501.     Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

502.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by information security experts or prior to experiencing a known security hack resulting from the Defects.

503.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

504.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

505.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

506.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

507.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which

unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

508.   Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

509.   Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

510.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Maine Class have been damaged in an amount to be determined at trial.

### COUNT 29
### Implied Warranty Of Merchantability, Me. Rev. Stat. Tit. 11 §§ 2-314 and 2-1212
### (On Behalf of Plaintiff Heidi Metzger and Maine Class Members)

511.   Plaintiff and the Maine Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

512.   Plaintiff asserts this claim individually and on behalf of Maine Class members.

513.   Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Me. Rev. Stat. Ann. Tit. 11, §§ 2-104(1), and 2-1103(3), and is a "seller" of the Affected Products under § 2-103(1)(d).

514.   The Affected Products are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11, §§ 2-105(1), and 2-1103(1)(h).

515.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11, §§ 2-314, and 2-1212.

516.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

517.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

518.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

519.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Maine Class members have been damaged in an amount to be proven at trial.

**MASSACHUSETTS – Counts 30 – 32**

**COUNT 30**
**Deceptive Acts or Practices Prohibited, Mass. Gen. Laws Ch. 93a, § 1, *et seq.***
**(On Behalf of Plaintiffs Howard Kramer Realty,**
**Bottone/Reiling, P.C., and Massachusetts Class Members)**

520.    Plaintiffs and the Massachusetts Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

521.    Plaintiffs assert this claim individually and on behalf of Massachusetts Class members.

522.    Defendant, Plaintiffs, and the Massachusetts Class are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

84 – PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

523.    Intel engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

524.    Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2.

525.    Intel participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

526.    In the course of its business, Defendant concealed and suppressed material facts concerning the Affected Products.

527.    Plaintiffs and Massachusetts Class members had no way of discerning that Intel's representations were false and misleading because the Defects in the Affected Products are highly technical and hard for a non-expert to identify and measure. Plaintiffs and Massachusetts Class members did not and could not unravel Intel's deception on their own.

528.    Defendant thus violated the Massachusetts Act by, at minimum marketing its processors as secure, and by presenting itself as a reputable manufacturer that valued privacy and security and stood behind its processors after they were sold, Intel engaged in deceptive business practices prohibited by the Massachusetts Act.

529.    In the course of its business, Intel willfully failed to disclose and actively concealed the processor Defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Intel also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Products.

530.    Intel intentionally and knowingly misrepresented material facts regarding the Affected Products with intent to mislead Plaintiffs and the Massachusetts Class.

531.    Intel knew or should have known that its conduct violated the Massachusetts Act.

532.    Defendant owed Plaintiffs a duty to disclose the Defects in the Affected Products because it:

        a.      possessed exclusive knowledge that they were manufacturing, selling, and distributing Affected throughout the United States that were affected by serious security Defects ;

        b.      intentionally concealed the foregoing from, Plaintiffs and Class members.

533.    The presence of the Spectre and Meltdown Defects in the processors and Intel's concealment of those Defects was material to Plaintiffs and the Massachusetts Class.

534.    Defendant' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true quality and security of the Affected Products.

535.    Plaintiffs and the Massachusetts Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant' misrepresentations and its concealment of and   failure to disclose material information.  Plaintiffs and the Massachusetts Class members who purchased the Affected Products would not have purchased at all and/or—if the processors' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of their processors, as well as lost or diminished use.

536.    Defendant has an ongoing duty to all Intel customers to refrain from unfair and deceptive practices under the Massachusetts Act.  All owners of Affected Products suffered

ascertainable loss in the form of the diminished value of their processors as a result of Intel's deceptive and unfair acts and practices made in the course of Intel's business.

537.    Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

538.    As a direct and proximate result of Defendant's violations of the Massachusetts Act, Plaintiffs and the Massachusetts Class have suffered injury-in-fact and/or actual damage.

539.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs and the Massachusetts Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and each Massachusetts Class member. Because Intel's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each Massachusetts Class member, up to three times actual damages, but no less than two times actual damages.

540.    Plaintiffs also seek an order enjoining Intel's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

541.    On March 26, 2018 Plaintiffs sent a letter complying with Mass. Gen. Laws ch. 93A, § 9(3). Because Intel failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Massachusetts Class are entitled.

542.    As a result of Intel's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**COUNT 31**
**Express Warranty, Mass. Gen. Laws c. 106 §§ 2-313 and 2A-210**
**(On Behalf of Plaintiffs Howard Kramer Realty,**
**Bottone/Reiling, P.C., and Massachusetts Class Members)**

543.    Plaintiffs and the Massachusetts Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

544.    Plaintiffs assert this claim individually and on behalf of Massachusetts Class members.

545.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Mass. Gen. Laws ch. 106 § 2-104(1) and a "seller" of the Affected Products under§ 2-103(1)(d).

546.    The Affected Products are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

547.    Intel marketed and advertised the Affected Products as secure.    Such representations formed a basis of the bargain that was reached when Plaintiffs and other Massachusetts Class members purchased the Affected Products.

548.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

549.    Plaintiffs and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

550.    Plaintiffs and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by information security experts or prior to experiencing a issues resulting from the Defects.

551.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

552.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

553.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

554.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

555.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiffs and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its

processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

556.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

557.    Plaintiffs and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

558.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and members of the Massachusetts Class have been damaged in an amount to be determined at trial.

## COUNT 32
### Implied Warranty of Merchantability, Mass. Gen. Laws ch. 106 §§ 2-314 and 2A-212
### (On Behalf of Plaintiffs Howard Kramer Realty,
### Bottone/Reiling, P.C., and Massachusetts Class Members)

559.    Plaintiffs and the Massachusetts Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

560.    Plaintiffs assert this claim individually and on behalf of Massachusetts Class members.

561.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Mass. Gen. Laws ch. 106 § 2-104(1) and is a "seller" of the Affected Products under § 2-103(1) (d).

562.    The Affected Products are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

563.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to Mass. Gen. Laws ch. 106 §§ 2- 314 and 2A-212.

564.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

565.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

566.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

567.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Massachusetts Class members have been damaged in an amount to be proven at trial.

**MONTANA – Counts 33 – 35**

**COUNT 33**
**Unfair Trade Practices and Consumer Protection Act of 1973**
**Mont. Code § 30-14-101, *et seq.***
**(On Behalf of Plaintiff Kevin Crawford and Montana Class Members)**

568.    Plaintiff and the Montana Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

569.    Plaintiff asserts this claim individually and on behalf of Montana Class members.

570.     Montana Class members are "consumer[s]" under Mont. Code § 30-14- 102(1).

571.    The sale of Affected Products to Montana Class members occurred within "trade and commerce" within the meaning of Mont. Code § 30-14-102(8), and Intel committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

572.    The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code § 30-14-103.

573.    In the course of its business, Defendant concealed and suppressed material facts concerning the Affected Products.

574.    Plaintiff and Montana Class members had no way of discerning that Intel's representations were false and misleading because the Defects in the Affected Products are highly technical and hard for a non-expert to identify and measure. Plaintiff    and    Montana    Class members did not and could not unravel Intel's deception on their own.

575.    Defendant thus violated the Act by, at minimum marketing its processors as secure, and by presenting itself as a reputable manufacturer that valued privacy and security and stood behind its processors after they were sold, Intel engaged in deceptive business practices prohibited by the Montana CPA.

576.    In the course of its business, Intel willfully failed to disclose and actively concealed the processor Defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Intel also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Products.

577.    Intel intentionally and knowingly misrepresented material facts regarding

the Affected Products with intent to mislead Plaintiff and the Montana Class.

578.    Intel knew or should have known that its conduct violated the Montana CPA.

579.    Defendant owed Plaintiff a duty to disclose the Defects in the Affected Products because it:

   a.  possessed exclusive knowledge that they were manufacturing, selling, and distributing Affected throughout the United States that were affected by serious security Defects ;

   b.  intentionally concealed the foregoing from, Plaintiff and Class members.

580.    The presence of the Spectre and Meltdown Defects in the processors and Intel's concealment of those Defects was material to Plaintiff and the Montana Class.

581.    Defendant' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true quality and security of the Affected Products.

582.    Plaintiff and the Montana Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant' misrepresentations and its concealment of and  failure to disclose material information.  Plaintiff and the Montana Class members who purchased the Affected Products would not have purchased at all and/or—if the processors' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of their processors, as well as lost or diminished use.

583.    Defendant has an ongoing duty to all Intel customers to refrain from unfair and deceptive practices under the Montana CPA. All owners of Affected Products suffered ascertainable loss in the form of the diminished value of their processors as a result of Intel's deceptive and unfair acts and practices made in the course of Intel's business.

584.    Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

585.    As a direct and proximate result of Defendant' violations of the Montana CPA, Plaintiffs and the Montana Class have suffered injury-in-fact and/or actual damage.

586.    Because Intel's unlawful methods, acts, and practices have caused Montana Class members to suffer an ascertainable loss of money and property, the Montana Class seeks from Intel actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, an order enjoining Intel's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under Mont. Code § 30-14-133.

## COUNT 34
### Express Warranty, Mont. Code §§ 30-2-313 and 30-2A-210
### (On Behalf of Plaintiff Kevin Crawford and Montana Class Members)

587.    Plaintiff and the Montana Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

588.    Plaintiff asserts this claim individually and on behalf of Montana Class members.

589.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Mont. Code § 30-2-104(1) and a "seller" of the Affected Products under § 30-2-103(1)(d).

590.    The Affected Products are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).

591.    Intel marketed and advertised the Affected Products as secure.    Such representations formed a basis of the bargain that was reached when Plaintiffs and other Montana Class members purchased the Affected Products.

592.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

593.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

594.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by cybersecurity experts or prior to experiencing a known security hack resulting from the Defects.

595.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

596.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

597.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

598.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

599.     Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

600.     Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

601.     Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

602.      As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Montana Class have been damaged in an amount to be determined at trial.

## COUNT 35
### Implied Warranty of Merchantability, Mont. Code §§ 30-2-314 and 30-2A-212
### (On Behalf of Plaintiff Kevin Crawford and Montana Class Members)

603.     Plaintiff and the Montana Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

604.     Plaintiff asserts this claim individually and on behalf of Montana Class members.

605.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Mont. Code § 30-2-104(1) and a "seller" of the Affected Products under § 30-2-103(1)(d).

606.    The Affected Products are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h)5.

607.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to Mont. Code §§ 30-2-314 and 30-2A-212.

608.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

609.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

610.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

611.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Montana Class members have been damaged in an amount to be proven at trial.

**NEW JERSEY – Counts 36 – 38**

**COUNT 36**

**New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1,** *et seq.*
**(On Behalf of Plaintiffs Angelo Pandazis and Maria Enik and New Jersey Class Members)**

612.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

613.    Plaintiffs assert this claim individually and on behalf of New Jersey Class members.

614.    Plaintiffs, the New Jersey Class members and Defendants are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

615.    Intel engaged in "sales" of "merchandise" within the meaning of N.J. Stat. §§ 56:8-1(c), (e).

616.    Intel's actions as set forth herein occurred in the conduct of trade or commerce.

617.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. § 56:8-2.

618.    In the course of its business, Defendant concealed and suppressed material facts concerning the Affected Products.

619.    Plaintiffs and New Jersey Class members had no way of discerning that Intel's representations were false and misleading because the defects in the Affected Products are highly technical and hard for a non-expert to identify and measure. Plaintiffs and New Jersey Class

members did not and could not unravel Intel's deception on their own.

620.   Defendants thus violated the Act by, at minimum marketing its processors as secure, and by presenting itself as a reputable manufacturer that valued privacy and security and stood behind its processors after they were sold, Intel engaged in deceptive business practices prohibited by the New Jersey CFA.

621.   In the course of its business, Intel willfully failed to disclose and actively concealed the processor defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Intel also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Products.

622.   Intel intentionally and knowingly misrepresented material facts regarding the Affected Products with intent to mislead Plaintiff and the New Jersey Class.

623.   Intel knew or should have known that its conduct violated the New Jersey CFA.

624.   Defendants owed Plaintiffs a duty to disclose the defects in the Affected Products because it:

a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing Affected throughout the United States that were affected by serious security defects;

b.   intentionally concealed the foregoing from, Plaintiff, Class members.

625.   The presence of the Spectre and Meltdown defects in the processors and Intel's concealment of those defects was material to Plaintiffs and the New Jersey Class.

626. Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true quality and security of the Affected Products.

627. Plaintiff and the New Jersey Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the New Jersey Class members who purchased the Affected Products would not have purchased at all and/or—if the processors' true nature had been disclosed—would have paid significantly less for them. Plaintiffs also suffered diminished value of their processors, as well as lost or diminished use.

628. Defendant has an ongoing duty to all Intel customers to refrain from unfair and deceptive practices under the New Jersey CFA. All owners of Affected Products suffered ascertainable loss in the form of the diminished value of their processors as a result of Intel's deceptive and unfair acts and practices made in the course of Intel's business.

629. Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

630. Plaintiffs and the New Jersey Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendant's deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

## COUNT 37
### Express Warranty, N.J. Stat §§ 12A:2-313 and 2A-210
### (On Behalf of Plaintiffs Angelo Pandazis and Maria Enik and New Jersey Class Members)

631.     Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

632.     Plaintiffs assert this claim individually and on behalf of New Jersey Class members.

633.     Intel is and was at all relevant times a "merchant" with respect to the Affected Products under N.J. Stat. § 12A:2-104(1) and a "seller" of the Affected Products under § 2-103(1)(d).

634.     The Affected Products are and were at all relevant times "goods" within the meaning of N.J. Stat. §§ 12A:2-105(1) and 2A-103(1)(h).

635.     Intel marketed and advertised the Affected Products as secure.   Such representations formed a basis of the bargain that was reached when Plaintiffs and other New Jersey Class members purchased the Affected Products.

636.     However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

637.     Plaintiffs and members of the Class experienced the existence of the defects in Intel processors within the warranty periods but had no knowledge of the existence of the defects, which was known and concealed by Defendant.

638.     Plaintiffs and members of the Class could not have reasonably discovered the defects in Intel processors prior to the public disclosure of the Defects by information security experts or prior to experiencing security or performance issues resulting from the Defects.

639.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

640.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

641.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

642.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the defects' existence at the time of sale of the processors.

643.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the defects.  The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant.  A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its

processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

644.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiffs and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

645.    Plaintiffs and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

646.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and members of the New Jersey Class have been damaged in an amount to be determined at trial.

## COUNT 38
### Implied Warranty of Merchantability, N.J. Stat. §§ 12A:2-314 and 2A-212
### On Behalf of Plaintiffs Angelo Pandazis and Maria Enik and New Jersey Class Members)

647.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

648.    Plaintiffs assert this claim individually and on behalf of New Jersey Class members.

649.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under N.J. Stat. § 12A:2-104(1) and a "seller" of the Affected Products under § 2-103(1)(d).

650.    The Affected Products are and were at all relevant times "goods" within the meaning of N.J. Stat. §§ 12A:2-105(1) and 2A-103(1)(h).

651.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to N.J. Stat. §§ 12A:2-314 and 2A-212.

652.     The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

653.     Specifically, the Affected Products had serious security defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

654.     Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of defects became public.

655.     As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other New Jersey Class members have been damaged in an amount to be proven at trial.

**NEW YORK – Counts 39 – 42**

**COUNT 39**

**Unlawful Deceptive Acts or Practices, NY Gen. Bus. Law § 349**
**(On Behalf of Plaintiff Edward Sibert and New York Class Members)**

656.     Plaintiff repeats and re-allege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

657.     Plaintiff asserts this claim individually and on behalf of New York Class members.

658.     New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

659.     The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the New York Subclass Members seek monetary damages and the entry of preliminary and permanent injunctive

relief against Defendant, enjoining it from inaccurately describing, labeling, marketing, and promoting the Affected Products.

660.    There is no adequate remedy at law.

661.    Defendant's improper consumer-oriented conduct is misleading in a material way in that it, inter alia, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendant's Affected Products and to use the Affected Products when they otherwise would not have.

662.    Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

663.    Plaintiff and the New York Subclass Members have been injured inasmuch as he paid a premium for Affected Products that were defective and vulnerable to exploit by unauthorized access, intrusion, or otherwise.

664.    Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

665.    Defendant's deceptive and misleading practices constitute deceptive acts and practices in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

666.    As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## COUNT 40
## False Advertising, NY Gen. Bus. Law § 350
## (On Behalf of Plaintiff Edward Sibert and New York Class Members)

667.    Plaintiff repeats and re-allege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

668.    Plaintiff asserts this claim individually and on behalf of New York Class members.

669.    N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

670.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

671.    Defendant's advertising failed to disclose the known Spectre and Meltdown Defects in the Affected Products.

672.    Plaintiff and the New York Subclass Members have been injured inasmuch as they the purchased the Affected Products in reliance on Defendant's misrepresentations.

673.    Defendant's advertising, induced the Plaintiff and the New York Subclass Members to buy Defendant's Product.

674.    Defendant made its untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

675.     Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

676.     Defendant made the material misrepresentations and omissions described in this Complaint in Defendant's advertising.

677.     Defendant's material misrepresentations and omissions were substantially uniform in content, presentation, and impact upon consumers at large.

678.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**COUNT 41**
**Express Warranty, NY UCC §§ 2-313 and 2A-210**
**(On Behalf of Plaintiff Edward Sibert and New York Class Members)**

679.     Plaintiff repeats and re-allege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

680.     Plaintiff asserts this claim individually and on behalf of New York Class members.

681.     Intel is and was at all relevant times a "merchant" with respect to the Affected Products under New York's Article 2 of the Uniform Commercial Code, NY UCC Law § 2-104(1) and a "seller" of the Affected Products under § 2-103(1)(d).

682.     The Affected Products are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

683.     Intel marketed and advertised the Affected Products as secure.   Such representations formed a basis of the bargain that was reached when Plaintiffs and other New York Class members purchased the Affected Products.

684.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

685.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

686.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by information security experts or prior to experiencing a known security hack resulting from the Defects.

687.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

688.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

689.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

690.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

691.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

692.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

693.    Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

694.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the New York Class have been damaged in an amount to be determined at trial.

### COUNT 42
### Implied Warranty of Merchantability, NY UCC Law §§ 2-314 and 2A-212
### (On Behalf of Plaintiff Edward Sibert and New York Class Members)

695.    Plaintiff repeats and re-allege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

696.    Plaintiff asserts this claim individually and on behalf of New York Class members.

697.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under New York's Uniform Commercial Code Law § 2-104(1) and a "seller" of the Affected Products under § 2-103(1)(d).

698.    The Affected Products are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

699.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to N.Y. UCC Law §§ 2- 314 and 2A-212.

700.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

701.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

702.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

703.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other New York Class members have been damaged in an amount to be proven at trial.

**NORTH CAROLINA - Counts 43-45**

## COUNT 43
### Unfair and Deceptive Trade Practices Act
### N.C. Gen. Stat. §§ 75.1.1 through 75-35
### (On Behalf of Plaintiff George Apple and North Carolina Class Members)

704.     Plaintiff re-alleges and incorporate the preceding paragraphs as if fully set forth herein.

705.     Plaintiff asserts this claim individually and on behalf of North Carolina Class members.

706.     The NCUDPA states: "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.

707.     Defendant was engaged in trade and commerce. Among other things, Defendant marketed, distributed, and manufactured products affected by the Spectre and/or Meltdown Defects in North Carolina.

708.     Prior to Plaintiff's and the proposed North Carolina State Class members' purchase of the Affected Products, Defendant engaged in unfair and deceptive practices that violated the NCUDPA.  As set forth in detail above, Defendant made statements and omitted material information that had and continue to have the capacity to deceive the public and caused injury to Plaintiff and proposed North Carolina State Class members because:

   a.     Defendant made uniform representations that its Affected Products were of a particular standard, quality, and grade when they were and are not.

   b.     Defendant failed to disclose the true standard, quality, and grade of its Affected Products.

c.      Defendant made uniform representations that the Affected Products would perform as represented when they did not.

d.      Defendant failed to disclose the true performance and security vulnerabilities of its Affected Products.

e.      Plaintiff and proposed class members reasonably expected that the Affected Products would perform as efficiently as advertised and would be not expose users to critical security vulnerabilities. These representations and affirmations of fact made by Defendant, and the facts they concealed or failed to disclose, are material facts that were likely to deceive reasonable consumers, and that reasonable consumers would, and did, rely upon in deciding whether or not to purchase the Affected Products. Defendant, moreover, intended for consumers, including Plaintiff and proposed North Carolina class members, to rely on these material facts.

709.    Defendant had exclusive knowledge that the Affected Products had and have the Defects set forth above which gave rise to a duty to disclose these facts. Defendant breached that duty by failing to disclose these material facts.

710.    The injury to consumers by this conduct greatly outweighs any alleged countervailing benefits to consumers or competition under all circumstances. There is a strong public interest in protecting electronic devices from security vulnerabilities and performance-based costs, as well as truthfully advertising and disclosing consumer appliance Defects that pose a risk to personal information.

711.    Had Plaintiff and proposed class members known about the design Defects and accompanying security and efficiency risks, or that the Affected Products did not operate as

advertised, they would not have purchased the Affected Products or would have paid less than they did for them because they weighed the cost and quality of alternatives. As a direct and proximate result of Defendant's actions, Plaintiff and proposed class members have suffered ascertainable loss and actual damages. Among other things, the market price of the Affected Products would have been lower had consumers known about the Defects.

712.    Plaintiff and North Carolina State Class members had no way of discerning that Defendant's representations were false and misleading prior to purchasing the Affected Products, or otherwise learning the facts that Defendant had concealed or failed to disclose prior to purchasing the Affected Products. Plaintiff and North Carolina State Class members did not, and could not, unravel Defendant's deception on their own.

713.    Defendant had an ongoing duty to Plaintiff and the North Carolina State Class to refrain from unfair and deceptive practices under the NCUDPA in the course of its business. Specifically, Defendant owed Plaintiff and North Carolina State Class members a duty to disclose all the material facts concerning the Affected Products because they possessed exclusive knowledge about the Affected Products, intentionally concealed that knowledge from Plaintiff and the North Carolina State Class, and made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

714.    Defendant's violations present continuing security and financial risks to Plaintiff and the North Carolina State Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

715.    Even now, the "fix" is insufficient to protect Plaintiff and the proposed North Carolina Class members because it severely degrades the performance efficiency of the Affected Products causing a loss of productivity.

716.    Defendant's conduct was not isolated because this case involves millions of Affected Products.  Additionally, during the same time that Defendant was selling the Affected Products, competitors were producing similar products that did not contain the Defects above. Therefore, it was possible for Defendant to manufacture products without the defect.

717.    Plaintiff and the proposed North Carolina State Class seek an order enjoining Defendant' unfair and deceptive acts or practices, and awarding treble damages, attorneys' fees, and any other just and proper relief available under the NCUDPA.  N.C. Gen. Stat. § 75-16.1.

## COUNT 44
### Express Warranty, N.C. Gen. Stat. §§ 25-2-313 and 252A-210
### (On Behalf of Plaintiff George Apple and North Carolina Class Members)

718.    Plaintiff re-alleges and incorporate the preceding paragraphs as if fully set forth herein.

719.    Plaintiff asserts this claim individually and on behalf of North Carolina Class members.

720.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of the Affected Products under § 25-2-103(1)(d).

721.    The Affected Products are and were at all relevant times "goods" within the meaning of N.C Gen. Stat. §§ 25-2-105(1) and 25-2A-103(1)(h).

722.    Intel marketed and advertised the Affected Products as secure.  Such representations formed a basis of the bargain that was reached when Plaintiffs and other North Carolina Class members purchased the Affected Products.

723.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

724.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

725.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by information security experts or prior to experiencing a known security hack resulting from the Defects.

726.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

727.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

728.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

729.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

730.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

731.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

732.    Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

733.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the North Carolina Class have been damaged in an amount to be determined at trial.

## COUNT 45
## Implied Warranty Of Merchantability, N.C. Gen. Stat. §§ 25-2-314 and 252A-212
### (On Behalf of Plaintiff George Apple and North Carolina Class Members)

734.    Plaintiff re-alleges and incorporate the preceding paragraphs as if fully set forth herein.

735.   Plaintiff asserts this claim individually and on behalf of North Carolina Class members.

736.   Intel is and was at all relevant times a "merchant" with respect to the Affected Products under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of the Affected Products under § 25-2-103(1)(d).

737.   The Affected Products are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. §§ 25-2-105(1) and 25-2A-103(1)(h)5.

738.   A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to N.C. Gen. Stat. § 25-2-314 and N.C. Gen. Stat. § 25-2A-212.

739.   The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

740.   Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

741.   Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

742.   As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other North Carolina Class members have been damaged in an amount to be proven at trial.

**OHIO – Counts 46 – 49**

**COUNT 46**

**Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.01,** *et seq.*
**(On Behalf of Plaintiff Parker Banning and the Ohio State Class Members)**

743.    Plaintiff and the Ohio Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

744.    Plaintiff asserts this claim individually and on behalf of Ohio Class members.

745.    Intel, Plaintiff and the Ohio Class are "persons" within the meaning of Ohio Rev. Code § 1345.01(B).

746.    Intel is a "supplier" as defined by Ohio Rev. Code § 1345.01(C).

747.    Plaintiff and the Ohio Class are "consumers" as that term is defined in Ohio Rev.Code § 1345.01(D), and their purchase of the Affected Products in them are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

748.    Ohio Rev. Code § 1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Ohio CSPA prohibits a supplier from (i) representing that goods have characteristics, uses or benefits which the goods do not have; (ii) representing that their goods are of a particular quality or grade that the product is not; and (iii) representing that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.

749.    In the course of its business, Defendant concealed and suppressed material facts concerning the Affected Products.

750.    Plaintiff and Ohio Class members had no way of discerning that Intel's representations were false and misleading because the Defects in the Affected Products are highly technical and hard for a non-expert to identify and measure. Plaintiff and Ohio Class members did not and could not unravel Intel's deception on their own.

751.    Defendant thus violated the provisions of the Ohio CSPA, at a minimum by: (1) representing that the Affected Products have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Products are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Products with the intent not to sell them as advertised; (4) failing to disclose information concerning the Affected Products with the intent to induce consumers to purchase the Affected Products.

752.    In the course of its business, Intel willfully failed to disclose and actively concealed the processor Defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Intel also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Products.

753.    Intel intentionally and knowingly misrepresented material facts regarding the Affected Products with intent to mislead Plaintiff and the Ohio Class.

754.    Intel knew or should have known that its conduct violated the Ohio CSPA.

755.    The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Intel in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a substantial defect, constitute deceptive sales practices in violation of the CSPA. These cases include, but are not limited to, the following:

a    *Mason v. Mercedes Benz USA, LLC*
(OPIF #10002382);

b.   *State ex rel. Betty D. Montgomery v. Ford Motor Co.*
(OPIF #10002123);

c.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.*
(OPIF #10002025);

d.   *Bellinger v. Hewlett-Packard Co.,*
No. 20744 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e.   *Borror v. MarineMax of Ohio,*
No. OT-06-010 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f.   *State ex rel. Jim Petro v. Craftmatic Organization, Inc.*
(OPIF #10002347);

g.   *Cranford v. Joseph Airport Toyota, Inc.*
(OPIF #10001586);

h.   *Brown v. Spears*
(OPIF #10000403);

i.   *Brinkman v. Mazda Motor of America, Inc.*
(OPIF #10001427);

j.   *Mosley v. Performance Mitsubishi aka Automanage*
(OPIF #10001326); and

k.   *Walls v. Harry Williams dba Butch's Auto Sales*
(OPIF #10001524).

756.   Defendant owed Plaintiff a duty to disclose the Defects in the Affected Products because it:

a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing Affected throughout the United States that were affected by serious security Defects ;

b.   intentionally concealed the foregoing from, Plaintiff and Class members.

757.   The presence of the Spectre and Meltdown Defects in the processors and Intel's concealment of those Defects was material to Plaintiff and the Ohio Class.

758.   Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true quality and security of the Affected Products.

759.   Plaintiff and the Ohio Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant' misrepresentations and its concealment of and failure to disclose material information.   Plaintiff and the Ohio Class members who purchased the Affected Products would not have purchased at all and/or—if the processors' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of their processors, as well as lost or diminished use.

760.   Defendant has an ongoing duty to all Intel customers to refrain from unfair and deceptive practices under the Ohio CSPA. All owners of Affected Products suffered ascertainable loss in the form of the diminished value of their processors as a result of Intel's deceptive and unfair acts and practices made in the course of Intel's business.

761.   Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

762.   As a direct and proximate result of Defendant' violations of the Ohio CSPA,

763.   Plaintiff and the Ohio Class have suffered injury-in-fact and/or actual damage. Pursuant to Ohio Rev. Code § 1345.09, Plaintiff and the Ohio Class seek an order enjoining Intel's unfair and/or deceptive acts or practices, actual damages - trebled, and fees, costs, and any other just and proper relief, to the extend available under the Ohio CSPA.

**COUNT 47**

**Deceptive Trade Practices Act, Ohio Rev. Code § 4165.01, *et seq.***
**(On Behalf of Plaintiff Parker Banning and the Ohio State Class Members)**

764.    Plaintiff and the Ohio Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

765.    Plaintiff asserts this claim individually and on behalf of Ohio Class members.

766.    Intel, Plaintiff and the Ohio Class are "persons" within the meaning of Ohio Rev. Code § 4165.01(D).

767.    Intel engaged in "the course of [its] business" within the meaning of Ohio Rev. Code § 4165.02(A) with respect to the acts alleged herein.

768.    The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(A) ("Ohio DTPA") provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation," the person does any of the following: "(7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …; (9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; … [or] (11) Advertises goods or services with intent not to sell them as advertised."

769.    In the course of its business, Defendant concealed and suppressed material facts concerning the Affected Products.

770.    Plaintiff and Ohio Class members had no way of discerning that Intel's representations were false and misleading because the Defects in the Affected Products are highly technical and hard for a non-expert to identify and measure. Plaintiff and Ohio Class members did not and could not unravel Intel's deception on their own.

771.    Defendant thus violated the  provisions of the Ohio DTPA, at a minimum by: (1) representing that the Affected Products have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Products are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Products with the intent not to sell them as advertised; (4) failing to disclose information concerning the Affected Products with the intent to induce consumers to purchase the Affected Products.

772.    In the course of its business, Intel willfully failed to disclose and actively concealed the processor Defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Intel also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Products.

773.    Intel intentionally and knowingly misrepresented material facts regarding the Affected Products with intent to mislead Plaintiff and the Ohio Class.

774.    Intel knew or should have known that its conduct violated the Ohio DTPA.

775.    Defendant owed Plaintiff a duty to disclose the Defects in the Affected Products because it:

      a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing Affected throughout the United States that were affected by serious security Defects ;

      b.    intentionally concealed the foregoing from, Plaintiff and Class members.

776.    The presence of the Defects in the processors and Intel's concealment of those Defects was material to Plaintiff and the Ohio Class.

777.    Defendant' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true quality and security of the Affected Products.

778.    Plaintiff and the Ohio Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant' misrepresentations and its concealment of and   failure to disclose material information.   Plaintiff and the Ohio Class members who purchased the Affected Products would not have purchased at all and/or—if the processors' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of their processors, as well as lost or diminished use.

779.    Defendant has an ongoing duty to all Intel customers to refrain from unfair and deceptive practices under the Ohio DTPA.  All owners of Affected Products suffered ascertainable loss in the form of the diminished value of their processors as a result of Intel's deceptive and unfair acts and practices made in the course of Intel's business.

780.    Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

781.    As a direct and proximate result of Defendant' violations of the Ohio DTPA, Plaintiff and the Ohio Class have suffered injury-in-fact and/or actual damage.

782.    Pursuant to Ohio Rev. Code § 1345.09, Plaintiff and the Ohio Class seek an order enjoining Intel's unfair and/or deceptive acts or practices, actual damages - trebled, and fees, costs, and any other just and proper relief, to the extend available under the Ohio DTPA.

**COUNT 48**

**Express Warranty, Ohio Rev. Code § 1302.26, et seq.) (U.C.C. § 2-313)**
**(On Behalf of Plaintiff Parker Banning and Ohio Class Members)**

783.     Plaintiff and the Ohio Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

784.     Plaintiff asserts this claim individually and on behalf of Ohio Class members.

785.     Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of the Affected Products under § 1302.01(4).

786.     The Affected Products are and were at all relevant times "goods" within the meaning of Ohio Rev. Code § 1310.01(A)(20).

787.     Intel marketed and advertised the Affected Products as secure.   Such representations formed a basis of the bargain that was reached when Plaintiffs and other Ohio Class members purchased the Affected Products.

788.     However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

789.     Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

790.     Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by cybersecurity experts or prior to experiencing known security or performance issues resulting from the Defects.

791.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

792.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

793.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

794.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

795.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class.  Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant.  A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its

processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

796.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

797.    Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

798.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Ohio Class have been damaged in an amount to be determined at trial.

**COUNT 49**

**Implied Warranty Of Merchantability, Ohio Rev. Code §§ 1302.27 and 1310.19**
**(On Behalf of Plaintiff Parker Banning and Ohio Class Members)**

799.    Plaintiff and the Ohio Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

800.    Plaintiff asserts this claim individually and on behalf of Ohio Class members.

801.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of the Affected Products under § 1302.01(4).

802.    The Affected Products are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8) and 1310.01(A)(8).

803.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to Ohio Rev. Code §§ 1302.27 and 1310.19.

804.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

805.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

806.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

807.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Ohio Class members have been damaged in an amount to be proven at trial.

**OREGON – Counts 50 – 52**

**COUNT 50**

**Unlawful Trade Practices Act, Or. Rev. Stat. § 646.607 *et. seq.***
**(On Behalf of Plaintiff Robert S. Key and Oregon Class Members)**

808.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

809.    Plaintiff asserts this claim individually and on behalf of Oregon Class Members.

810.    Plaintiff and Defendant are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

811.    Defendant is engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8). 58. The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unlawful practice . . . in the course of . . . business." Or. Rev. Stat. § 646.608(1).

812.    In the course of its business, Defendant, through its agents, employees, and/or subsidiaries, violated the Oregon UTPA as detailed above. Specifically, Defendant developed and sold Defective processors and failed to disclose known Defects in the processors. Defendant engaged in one or more of the following unfair or deceptive acts or practices as defined in Or. Rev. Stat. § 646.608(1):

    a.    Causing likelihood of confusion or of misunderstanding as to the rating, approval or certification of the CPUs;

    b.    Representing that the CPUs have characteristics, uses, or benefits that they do not have;

    c.    Representing that the CPUs are of a particular standard, quality and grade when they are not; and/or

    d.    Advertising the CPUs with the intent not to sell them as advertised.

813.    Defendant's failure to disclose Defects in the processors was material to Plaintiff and other class members residing in Oregon, as Defendant intended. Had they known the truth, Plaintiff and other class members residing in Oregon would not have purchased the processors or would have paid significantly less money to buy the defective products.

814.    Plaintiff and other class members residing in Oregon had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose, because the Defects are highly technical and hard for a non-expert to identify and measure. Plaintiff and other class members residing in Oregon did not, and could not, unravel Defendant's deception on their own.

815.    Defendant had an ongoing duty to Plaintiff and other class members residing in Oregon to refrain from unfair and deceptive practices under the Oregon UTPA in the course of

their business. Specifically, Defendant owed Plaintiff and other class members residing in Oregon a duty to disclose all the material facts concerning the processors because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff and other class members residing in Oregon, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

816.    Plaintiff and other class members residing in Oregon suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's conduct. 64. Defendant's violations present a continuing risk to Plaintiff and other class members residing in Oregon, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

817.    Pursuant to Or. Rev. Stat. § 646.638, Plaintiff and other class members residing in Oregon seek an order enjoining Defendant's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Oregon UTPA.

### COUNT 51
### Express Warranty, Or. Rev. Stat. §§ 72.3130 and 72A.2100
### (On Behalf of Plaintiff Robert S. Key and Oregon Class Members)

818.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

819.    Plaintiff asserts this claim individually and on behalf of Oregon Class Members.

820.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and a "seller" of the Affected Products § 72.1030(1)(d).

821.    The Affected Products are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

822.    Intel marketed and advertised the Affected Products as secure. Such representations formed a basis of the bargain that was reached when Plaintiffs and other Oregon Class members purchased the Affected Products.

823.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

824.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

825.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by cybersecurity experts or prior to experiencing a known security hack resulting from the Defects.

826.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

827.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

828.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

829.     Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

830.     Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

831.     Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

832.     Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

833.      As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Oregon Class have been damaged in an amount to be determined at trial.

**COUNT 52**

**Implied Warranty Of Merchantability, Or. Rev. Stat. § 72.3140 and 72A.2120**
**(On Behalf of Plaintiff Robert S. Key and Oregon Class Members)**

834.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

835.    Plaintiff asserts this claim individually and on behalf of Oregon Class Members.

836.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and a "seller" of the Affected Products under § 72.1030(1)(d).

837.    The Affected Products are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

838.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to Or. Rev. Stat. §§ 72.3140 and 72A-2120.

839.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

840.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

841.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

842.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Oregon Class members have been damaged in an amount to be proven at trial.

**PENNSYLVANIA – Counts 53 – 55**

**COUNT 53**

**Unfair Trade Practices And Consumer Protection Law, 73 P.S. § 201-1, *et seq.***
**(On Behalf of Plaintiff Ashley Price and Pennsylvania Class Members)**

843.    Plaintiff and the Pennsylvania Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

844.    Plaintiff asserts this claim individually and on behalf of Pennsylvania Class members.

845.    Intel, Plaintiff, and the Pennsylvania Class are "persons" within the meaning of 73 P.S. § 201-2.(2).

846.    Intel is engaged in "trade" or "commerce" within the meaning of 73 P.S. 16§ 201-2(3).

847.    The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." 73 P.S. 19  201-3.

848.    In the course of its business, Defendant concealed and suppressed material facts concerning the Affected Products.

849.    Plaintiff and Pennsylvania Class members had no way of discerning that Intel's representations were false and misleading because the Defects in the Affected Products are highly technical and hard for a non-expert to identify and measure.

850.    Plaintiff and Pennsylvania Class members did not and could not unravel Intel's deception on their own.

851.    Defendant thus violated the Pennsylvania UTPA by, at minimum marketing its processors as secure, and by presenting itself as a reputable manufacturer that valued privacy and security and stood behind its processors after they were sold, Intel engaged in deceptive business practices prohibited by the Pennsylvania UTPA.

852.    In the course of its business, Intel willfully failed to disclose and actively concealed the processor Defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Intel also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Products.

853.    Intel intentionally and knowingly misrepresented material facts regarding the Affected Products with intent to mislead Plaintiff and the Pennsylvania Class.

854.    Intel knew or should have known that its conduct violated the Pennsylvania CPL.

855.    Defendant owed Plaintiff a duty to disclose the Defects in the Affected Products because it:

        a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing Affected throughout the United States that were affected by serious security Defects;

        b.    intentionally concealed the foregoing from, Plaintiff and Class members.

856.    The presence of the Defects in the processors and Intel's concealment of those Defects was material to Plaintiff and the Pennsylvania Class.

857.    Defendant' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true quality and security of the Affected Products.

858.    Plaintiff and the Pennsylvania Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant' misrepresentations and its concealment of and failure to disclose material information.  Plaintiff and the Pennsylvania Class members who purchased the Affected Products would not have purchased at all and/or—if the processors' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of their processors, as well as lost or diminished use.

859.    Defendant has an ongoing duty to all Intel customers to refrain from unfair and deceptive practices under the Pennsylvania UTPA. All owners of Affected Products suffered ascertainable loss in the form of the diminished value of their processors as a result of Intel's deceptive and unfair acts and practices made in the course of Intel's business.

860.    Defendant's violations present a continuing risk to Plaintiff as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

861.    As a direct and proximate result of Defendant' violations of the Pennsylvania UTPA, Plaintiff and the Pennsylvania Class have suffered injury-in-fact and/or actual damage.

862.    Pursuant to 73 P.S. § 201-9.2(a), Plaintiff and the Pennsylvania Class seek an order enjoining Intel's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Pennsylvania UTPA.

**COUNT 54**
**Express Warranty, 13 Pa. Cons. Stat. §§ 2313 and 2A210**
**(On Behalf of Plaintiff Ashley Price and Pennsylvania Class Members)**

863.    Plaintiff and the Pennsylvania Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

864.    Plaintiff asserts this claim individually and on behalf of Pennsylvania Class members.

865.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Pa. Cons. Stat. § 2104 and 2A103(a), and a "seller" of the Affected Products under § 2103(a).

866.    The Affected Products are and were at all relevant times "goods" within the meaning of Pa. Cons. Stat. § 2105(a), and 2A103(a).

867.    Intel marketed and advertised the Affected Products as secure.   Such representations formed a basis of the bargain that was reached when Plaintiffs and other Pennsylvania Class members purchased the Affected Products.

868.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

869.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

870.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by information security experts or prior to experiencing a known security vulnerability resulting from the Defects.

871.   Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

872.   Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and have not and do not perform as warranted.

873.   Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

874.   Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

875.   Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its

processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

876.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses. Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

877.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Pennsylvania Class have been damaged in an amount to be determined at trial.

**COUNT 55**
**Implied Warranty of Merchantability, 13 Pa. Cons. Stat. §§ 2314 and 2A212)**
**(On Behalf of Plaintiff Ashley Price and Pennsylvania Class Members)**

878.    Plaintiff and the Pennsylvania Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

879.    Plaintiff asserts this claim individually and on behalf of Pennsylvania Class members.

880.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of the Affected Products under § 2103(a).

881.    The Affected Products are and were at all relevant times "goods" within the meaning of Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

882.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to Pa. Cons. Stat. §§ 2314 and 2A212.

883.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

884.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

885.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

886.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Pennsylvania Class members have been damaged in an amount to be proven at trial.

**TENNESSEE – Counts 56 – 58**

**COUNT 56**
**Consumer Protection Act, Tenn. Code §§ 47-18-101, *et seq.***
**(On Behalf of Plaintiff Seren Alvarez and Tennessee Class Members)**

887.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

888.    Plaintiff asserts this claim individually and on behalf of Tennessee Class members.

889.    Plaintiff Alvarez and the members of the Class are "natural persons" and "consumers" under Tenn. Code § 47-18-103(2).

890.    Defendant is a "person" under Tenn. Code § 47-18-103(9).

891.     Defendant's sales of the Affected Products constitute "consumer transactions" under Tenn. Code § 47-18-103(9).

892.     The Tennessee Consumer Protection Act prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce."

893.     Defendant's conduct in concealing the Spectre and Meltdown Defects and misrepresenting the quality and characteristics of the Affected Products constitutes an "unfair or deceptive act or practice affecting the conduct of any trade or commerce." Specifically, Defendant conduct as explained in this complaint is in violation of the following sections: Tenn. Code Ann. § 47-18-104(5), (7), and/or (9).

894.     Defendant's conduct was willful and knowing. Plaintiff Alvarez and the Class seek actual and treble damages, punitive damages, attorneys' fees and costs and any other just and proper relief under the Tennessee Consumer Protection Act, § 47-18-109(a)(3).

## COUNT 57
### Express Warranty, Tenn. Code §§ 47-2-313 and 47-2A-210)
### (On Behalf of Plaintiff Seren Alvarez and Tennessee Class Members)

895.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

896.     Plaintiff asserts this claim individually and on behalf of Tennessee Class members.

897.     Intel is and was at all relevant times a "merchant" with respect to the Affected Products Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and a "seller" of the Affected Products under § 47-2-103(1)(d).

898.     The Affected Products are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

899.    Intel marketed and advertised the Affected Products as secure.    Such representations formed a basis of the bargain that was reached when Plaintiffs and other Tennessee Class members purchased the Affected Products.

900.    However, the Intel Processors were not secure, given that they were subject to the Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

901.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

902.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by cybersecurity experts or prior to experiencing known security vulnerabilities resulting from the Defects.

903.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

904.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

905.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

906.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its

processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

907.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

908.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

909.    Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

910.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Tennessee Class have been damaged in an amount to be determined at trial.

## COUNT 58

### Implied Warranty Of Merchantability, Tenn. Code §§ 47-2-314 and 47-2A-212
### (On Behalf of Plaintiff Seren Alvarez and Tennessee Class Members)

911.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

912.    Plaintiff asserts this claim individually and on behalf of Tennessee Class members.

913.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and a "seller" of the Affected Products under § 47-2-103(1)(d).

914.    The Affected Products are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

915.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to  Tenn. Code §§ 47-2- 314 and 47-2A-212.

916.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

917.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

918.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

919.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Tennessee Class members have been damaged in an amount to be proven at trial.

**TEXAS – Counts 59 – 61**

**COUNT 59**

**Deceptive Trade Practices Act, Tex. Stat. §§ 17.41 *et seq.***
**(On Behalf of Plaintiff Ben Richardson and Texas Class Members)**

920.    Plaintiff and Texas Class Members re-allege and incorporate the preceding paragraphs as if fully set forth herein.

921.    Plaintiff brings this claim individually and on behalf of Texas Class members.

922.    On March 22, 2018, Plaintiff sent the required notice to Intel.

923.    The Texas Deceptive Trade Practices Act ("DTPA") prohibits, inter alia, "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce, including, but not limited to: representing that goods or services are of a particular standard, quality, or grade, or that goods, are of a particular style or model; and failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." § 17.46

924.    Plaintiff Richardson and each member of the Texas Class is a "consumer" as defined in the DTPA.

925.    Defendant violated the following provisions of the DTPA:

a       Tex. Bus. & Com. Code §17.50(1): the use or employment of a false, misleading, or deceptive acts or practices as defined in §17.46(b)(5), §17.46(b)(7), §17.46(b)(20), and §17.46(b)(24) of the DTPA that were

detrimentally relied upon by Plaintiff and each member of the Texas Class; and

b.    Tex. Bus. & Com. Code §17.50(3): an unconscionable action or course of action as defined by §17.45(5). 162. Defendant's violations of the DTPA were committed knowingly and intentionally as those terms are defined in §17.45(9) and §17.45(13) of the DTPA.

926.    Defendant's conduct was a producing and/or proximate cause of actual damages to Plaintiff and each member of the Texas Class.

927.    Plaintiff and Texas Class members demand judgment against Defendant for compensatory damages in an amount to be determined at trial (Plaintiff and Texas Class members will seek treble damages for the intentional and knowing conduct of Defendant, together with reasonable attorneys' fees and costs.

**COUNT 60**
**Express Warranty, Tex. Bus. & Com. Code §§ 2.313 and 2A.210**
**(On Behalf of Plaintiff Ben Richardson and Texas Class Members)**

928.    Plaintiff and Texas Class Members re-allege and incorporate the preceding paragraphs as if fully set forth herein.

929.    Plaintiff brings this claim individually and on behalf of Texas Class members.

930.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and a "seller" of the Affected Products under § 2.103(a)(4).

931.    The Affected Products are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

932.    Intel marketed and advertised the Affected Products as secure.    Such representations formed a basis of the bargain that was reached when Plaintiffs and other Texas Class members purchased the Affected Products.

933.    However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

934.    Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

935.    Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by cybersecurity experts or prior to experiencing known security vulnerabilities resulting from the Defects.

936.    Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

937.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

938.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

939.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed

the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

940.     Any attempt by Defendant to disclaim or limit the express warranties made to consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

941.     Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

942.     Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

943.      As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Texas Class have been damaged in an amount to be determined at trial.

## COUNT 61

## Implied Warranty Of Merchantability, Tex. Bus. & Com. Code §§ 2.314 and 2A.212
### (On Behalf of Plaintiff Ben Richardson and Texas Class Members)

944.    Plaintiff and Texas Class Members re-allege and incorporate the preceding paragraphs as if fully set forth herein.

945.    Plaintiff brings this claim individually and on behalf of Texas Class members.

946.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and a "seller" of the Affected Products under § 2.103(a)(4)

947.    The Affected Products are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

948.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

949.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

950.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

951.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

952.     As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Texas Class members have been damaged in an amount to be proven at trial.

**UTAH – Counts 62 – 64**

**COUNT 62**
**Consumer Sales Practices Act, Utah Code § 13-11-1, *et seq.***
**(On Behalf of Plaintiff Aaron Grover and Utah Class Members)**

953.     Plaintiff and the Utah Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

954.     Plaintiff brings this claim individually and on behalf of Utah Class members.

955.     Plaintiff and Utah Class members are "persons" under the Utah Consumer Sales Practices Act ("Utah CSPA"), Utah Code § 13-11-3(5). The sales of the Affected Products to the Plaintiff and Utah Class members were "consumer transactions" within the meaning of Utah Code § 13-11-3(2).

956.     Intel is a "supplier" within the meaning of Utah Code § 13-11-3(6).

957.     The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction." Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." Utah Code § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. Utah Code § 13-11-5.

958.    Defendant thus violated the Utah CSPA by, at minimum: (1) representing that the processors have characteristics, uses, and benefits which they do not have; (2) representing that the processors are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Products with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce. Utah Code § 13-11-5.

959.    In the course of its business, Intel willfully failed to disclose and actively concealed the processor Defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Intel also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Products.

960.    Intel intentionally and knowingly misrepresented material facts regarding the Affected Products with intent to mislead Plaintiff and the Utah Class.

961.    Intel knew or should have known that its conduct violated the Utah CSPA.

962.    Defendant owed Plaintiff a duty to disclose the Defects in the Affected Products because it:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing Affected throughout the United States that were affected by serious security Defects ;

b.    intentionally concealed the foregoing from, Plaintiff and Class members.

963. The presence of the Spectre and Meltdown Defects in the processors and Intel's concealment of those Defects was material to Plaintiff and the Utah Class.

964. Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true quality and security of the Affected Products.

965. Plaintiff and the Utah Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Utah Class members who purchased the Affected Products would not have purchased at all and/or—if the processors' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of their processors, as well as lost or diminished use.

966. Defendant has an ongoing duty to all Intel customers to refrain from unfair and deceptive practices under the Utah CSPA. All owners of Affected Products suffered ascertainable loss in the form of the diminished value of their processors as a result of Intel's deceptive and unfair acts and practices made in the course of Intel's business.

967. Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

968. As a direct and proximate result of Defendant's violations of the Utah CSPA, Plaintiffs and the Utah Class have suffered injury-in-fact and/or actual damage.

969. Plaintiff and the Utah Class seek an order enjoining Intel's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Utah CSPA.

## COUNT 63
### Express Warranty, Utah Code §§ 70A-2-313 and 70A-2A-210
### (On Behalf of Plaintiff Aaron Grover and Utah Class Members)

970.     Plaintiff and the Utah Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

971.     Plaintiff brings this claim individually and on behalf of Utah Class members.

972.     Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and a "seller" of motor the Affected Products under § 70A-2-103(1)(d).

973.     The Affected Products are and were at all relevant times "goods" within the meaning of §§ 70A-2-105(1) and 70A-2a-103(1)(h).

974.     Intel marketed and advertised the Affected Products as secure.  Such representations formed a basis of the bargain that was reached when Plaintiffs and other Utah Class members purchased the Affected Products.

975.     However, the Intel Processors were not secure, given that they were subject to the Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

976.     Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

977.     Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by cybersecurity experts or prior to experiencing known security vulnerabilities resulting from the Defects.

978.     Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its

processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

979.    Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

980.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

981.    Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

982.    Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

983.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

984.    Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

985.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Utah Class have been damaged in an amount to be determined at trial.

## COUNT 64
### Implied Warranty Of Merchantability, Utah Code §§ 70A-2-314 and 70A-2A-212
### (On Behalf of Plaintiff Aaron Grover and Utah Class Members)

986.    Plaintiff and the Utah Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

987.    Plaintiff brings this claim individually and on behalf of Utah Class members.

988.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and a "seller" of the Affected Products under § 70A-2-103(1)(d).

989.    The Affected Products are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

990.    A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to Utah Code §§ 70A-2- 314 and 70A-2a-212.

991.    The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

992.    Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

993.    Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the vulnerabilties became public.

994.    As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Utah Class members have been damaged in an amount to be proven at trial.

**VIRGINIA – Counts 65 – XX**

**COUNT 65**

**Virginia Consumer Protection Act, Va. Code §§ 59.1-198** *et seq.*
**(On Behalf of Plaintiff Martin Hall and Virginia Class Members)**

995.    Plaintiff and the Virginia Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

996.    Plaintiff asserts this claim individually and on behalf of the Virginia Class members.

997.    The Virginia Consumer Protection Act ("VCPA") prohibits, inter alia, misrepresenting that goods or services are of a particular standard, quality, grade, style, or model. Va. Code § 59.1-200.

998.    Defendant is a "supplier" within the meaning of the VCPA. Va. Code § 59.1-198.

999.    Defendant engaged in "consumer transactions" with Plaintiff and Class Members within the meaning of VCPA.

1000.   Plaintiff and Class Members purchased the Affected Products which constitute "goods" within the meaning of the VCPA.

1001.   Defendant misrepresented and continues to misrepresent that Affected Products containing the defective Intel chips have or had certain characteristics, are or were of a particular standard, quality, or grade, and committed and continues to commit various other acts of deception, false pretense, false promise, or misrepresentations in connections with consumer transactions, including, among other things:

 a. Marketing, selling, or distributing Affected Products that contain the Spectre and/or Meltdown Defects;

 b. Making false or misleading statements or omitting to disclose material information regarding the Defects in Affected Products with Intel processors;

1002.   Defendant's improper consumer-oriented conduct is misleading in a material way in that Plaintiff and Virginia Class Members relied on Defendant's representations regarding performance and security of Affected Products and were induced thereby to pay a premium for the Affected Products when they otherwise would not have. Defendant made its untrue and/or misleading statements and representations willful, wantonly, and with reckless disregard for the truth.

1003.   As a direct and proximate result of Defendant's unfair and deceptive trade practices, Plaintiff and Class Members were deceived into paying a premium for the Affected Products and have been exposed to serious security vulnerabilities.

1004.   Defendant's deceptive and misleading practices constitute violations of the VCPA and Plaintiff and Class Members have been damaged thereby.

1005.   As a result of Defendant's ongoing conduct, Plaintiff and Class Members are entitled to monetary, compensatory, treble, and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## COUNT 66
### Express Warranty, Va. Code §§ 8.2-313 and 8.2A-210
### (On Behalf of Plaintiff Martin Hall and Virginia Class Members)

1006.   Plaintiff and Virginia Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

1007.   Plaintiff asserts this claim individually and on behalf of Virginia Class members. Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and a "seller" of Affected Products under § 8.2-103(1)(d).

1008.   The Affected Products are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

1009.   Intel marketed and advertised the Affected Products as secure.   Such representations formed a basis of the bargain that was reached when Plaintiffs and other Virginia Class members purchased the Affected Products.

1010.   However, the Intel Processors were not secure, given that they were subject to the Spectre and Meltdown Defects which rendered them vulnerable to exploit by unauthorized access, intrusion, or otherwise.

1011.   Plaintiff and members of the Class experienced the existence of the Defects in Intel processors within the warranty periods but had no knowledge of the existence of the Defects, which was known and concealed by Defendant.

1012.   Plaintiff and members of the Class could not have reasonably discovered the Defects in Intel processors prior to the public disclosure of the Defects by cybersecurity experts or prior to experiencing a known security hack resulting from the Defects.

1013.   Defendant breached the express warranty by selling Intel processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

1014.   Intel processors were not of merchantable quality and were unfit for the ordinary purposes for which Intel processors are used because of the existence of the Defects, and do not perform as warranted.

1015.   Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defects much earlier.

1016.   Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defects' existence at the time of sale of the processors.

1017.   Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing customers about the Defects. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which

unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

1018.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing Intel processors, or devices containing Intel processors, under false pretenses.

1019.    Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

1020.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Virginia Class have been damaged in an amount to be determined at trial.

**COUNT 67**
**Implied Warranty of Merchantability, Va. Code §§ 8.2-314 and 8.2A-212**
**(On Behalf of Plaintiff Martin Hall and Virginia Class Members)**

1021.    Plaintiff and Virginia Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

1022.    Plaintiff asserts this claim individually and on behalf of Virginia Class members.

1023.    Intel is and was at all relevant times a "merchant" with respect to the Affected Products under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and a "seller" of the Affected Products under § 8.2-103(1)(d).

1024.    The Affected Products are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

1025.   A warranty that the Affected Products were in merchantable condition and fit for the ordinary purpose for which processors are used is implied by law pursuant to Va. Code §§ 8.2-314 and 8.2A-212.

1026.   The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used.

1027.   Specifically, the Affected Products had serious security Defects which made the processors vulnerable to exploit by unauthorized access, intrusion, or otherwise.

1028.   Intel was provided notice of these issues by Project Zero, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Defects became public.

1029.   As a direct and proximate result of the Intel's breach of the implied warranty of merchantability, Plaintiffs and the other Virginia Class members have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request judgment as follows:

(a) Certifying the proposed Class and Subclasses under Rule 23(a) and (b) of the Federal Rules of Civil Procedure;

(b) Awarding Plaintiffs and other members of the Class damages, together with pre- and post-judgment interest thereon, costs, and attorney's fees as authorized by statute;

(c) Awarding Plaintiffs and the Class appropriate injunctive relief, including the replacement or repair of the processors in the Affected Products.

(d) Awarding Plaintiffs and the other Class members such other and further relief as the

Court deems just and proper.

## **PLAINTIFFS HEREBY REQUEST A TRIAL BY JURY**

Dated:  March 28, 2018                    By:      */s/ Bonner C. Walsh*

Bonner Walsh, Esq. Oregon Bar No. 131716
**WALSH LLC**
1561 Long Haul Road
Grangeville, ID 83530
Tel: (541) 359-2827
Fax: (866) 503-8206
bonner@walshpllc.com

**THE SULTZER LAW GROUP P.C.**
Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Adam Gonnelli, Esq.
85 Civic Center Plaza, Suite 104
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com

**KAMERMAN, UNCYK, SONIKER, &**
**KLEIN P.C.**
Akiva M. Cohen, Esq.
1700 Broadway, 42 Floor
New York, NY 10019
Tel: (212) 400-4930
Fax: (866) 221-6122
Acohen@kusklaw.com

**LEEDS BROWN LAW**
Jeffrey K. Brown, Esq.
One Old Country Road, Suite 347
Carle Place, New York 11514
Tel : (516) 873-9550
Fax : (516) 747-5024
jbrown@leedsbrownlaw.com

**SHOOP A PROFESSIONAL LAW CORPORATION**
David Shoop, Esq.
350 S. Beverly Drive, Suite 330
Beverly Hills, CA 90212
Tel: (877)-324-6853
Fax: (323)-677-1836
david.shoop@shoop.law.com

**HALUNEN LAW**
Melissa S. Weiner, Esq.
Amy E. Boyle, Esq.
1650 IDS Center
80 South Eighth Street
Minneapolis, Minnesota  55402
Tel: (612) 605-4098
Fax: (612) 605-4099
weiner@halunenlaw.com

**BRANSTETTER, STRANCH & JENNINGS, PLLC**
J. Gerard Stranch, IV, Esq.
The Freedom Center
223 Rosa L. Parks Blvd., Suite 200
Nashville, Tennessee 37203
Tel: (615) 254-8801
Fax: (615) 255-5419
gerards@bsjfirm.com

**DICELLO LEVITT & CASEY**
Adam Levitt, Esq.
Ten North Dearborn Street
11th Floor
Chicago, IL 60602
Tel: (312) 214-7900
alevitt@dlcfirm.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Robert Shelquist, Esq.
100 Washington Avenue S.
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
rkshelquist@locklaw.com

**CUNEO GILBERT & LaDUCA, LLP**
Charles J. LaDuca, Esq.
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016
Tel: (202) 789-3960
Fax: (202) 789-1813
charlesl@cuneolaw.com

Frank S. Gattuso, Esq.
9 Landgrove Drive
Fayetteville, NY 13066
Frankgattuso14@gmail.com

*Counsel for Plaintiffs and the Class*

## PROOF OF MAILING

Under ORS 646.638(2), I declare and certify that on the date below I caused a copy of this complaint to be mailed to the Oregon Attorney General at the following address:

**Ellen Rosenblum**
**Oregon Attorney General**
**Oregon Department of Justice**
**1162 Court Street NE**
**Salem, Oregon 97301-4096**

March 28, 2018

*/s/ Bonner Walsh*
Bonner Walsh, Esq.
1561 Long Haul Road
Grangeville ID 83530
Tel: (541) 359-2827
Fax: (866) 503-8206
bonner@walshpllc.com